UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMMANUEL G. JUSTINIANO, JOSE NIEVES, JOSE BARBOSA, DAHEED WILLIS, ANTHONY KEITT, FRANK FODERA, JOSHUA MOSS, OSCAR PUERTA, LUIS ARENAZA, GUILLERMO MUNOZ, MILTON LAVERDE, WILLIE S. BREWER, ISMAEL FRANCISCO, STEVE M. NG, MANUEL SANTOS, JULIO RIVERA, FREDDY VELEZ, BRYONT A LOPEZ, MIGUEL CABREJA, JUAN VEVAS, TERRENCE JONES, NICOLAS SALGADO, LUIS A. VEGA, LOUIS TELESE, KENNETH WARING, ANTONY G. HILL, JOSE GOMEZ ROSARIO, RODERICK MASHALL, JOSE BLANCO, DAVID BAEZ, KENYA EARLY, SAMMY HERNANDEZ, NELSON MINYETY, BILL DELVIN, EDWIN J. RAMIREZ CESPEDES, BENTO RODRIGUEZ, PAUL STARAPOLA, ANDRES REYES, JESUS A. MARTINEZ, DAVID BEACH, JONATHAN DELROSARIO, JAMES SHAW, GARFIELD GAMMON, DESEAN ALLEN, DERREK HUGHES, JORGE A. MILANES, *and* CARMELO NYANDUGAR, *each individually and on behalf of all other individuals similarly situated*,

Plaintiffs,

v.

PHOENIX BEVERAGES, INC., WINDMILL DISTRIBUTING COMPANY LP, d/b/a PHOENIX/BEEHIVE, RODB, LLC, LONGFENG TRUCKING, LLC, PHOENIX BEVERAGES MTO, LLC, FORBEE CAPITAL KEG FUND, LLC, HEINEKEN NORTH AMERICA, INC., HEINEKEN USA INCORPORATED, RODNEY BREYMAN, GREGORY BREYMAN, PAUL ROSSI, JOSEPH STANICH, *and* GEORGE STRADA,

Defendants.

Case No. 13-CV-2332 (TLS) (JLC)

**DECLARATION OF RODNEY BRAYMAN**

**RODNEY BRAYMAN**[1] declares, pursuant to 28 U.S.C. § 1746, that:

1. I am the President and Chief Executive Officer ("CEO") of Windmill Distributing Company, LP, d/b/a Phoenix/Beehive ("Windmill"). I have been employed by Windmill for the past forty-five (45) years. I have personal knowledge of the matters set forth herein. I make this declaration in support of Defendants' (collectively "Phoenix" or "Defendants") Motion to Dismiss Plaintiffs' Amended Complaint.

2. Phoenix is a family-owned business. Its partners and affiliates are all part of the corporate family and do not operate as independent entities. As President and CEO of Windmill, my duties and responsibilities include overseeing the operations of the entire Phoenix corporate family.

3. Windmill is a general partnership and does business as Beehive in Manhattan and Bronx, New York, and as Phoenix in the rest of New York State.

4. Defendants Phoenix Beverages, Inc., RODB, LLC and Heineken USA Incorporated are partners of Windmill.

5. Defendant Long Feng Trucking, LLC is a Windmill affiliate that operates the company's delivery trucks with Phoenix drivers who deliver all the products from Phoenix's warehouse and return the empty bottles, cans, kegs, cardboard cases and pallets to Phoenix's recycling operation.

6. Defendant Phoenix Beverages MTO, LLC is a Windmill affiliate that leases the company's warehouse space.

7. Defendant Forbee Capital Keg Fund, LLC is a non-operational corporation owned by Windmill.

---

[1] Incorrectly spelled "Breyman" in the case caption.

8. Defendant Gregory Brayman, incorrectly spelled "Breyman" in the case caption, is the Vice President of Operations of Windmill.

9. Defendants Paul Rossi, Joseph Stanich and George Strada are employed as managerial and supervisory warehouse employees of Windmill.

10. Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is made on behalf of all of the foregoing defendants.

11. The defendant named as "Heineken North America, Inc." is not an operating company in the beer business and has never been related to Heineken USA Incorporated.

## I. The Products Phoenix Distributes Within New York State Are Transported Into New York Across State Lines

12. Phoenix is in the business of distributing alcoholic beverages to its customers located in New York State. Almost all of the beverages (approximately 95%) are received by Phoenix from out of New York State. Phoenix is primarily a distributor of beer products, but also distributes wine and spirits (collectively "liquor") products which account for about six percent (6%) of its beverage sales.

13. Phoenix formerly operated its business on Review Avenue in Queens, New York. It is now located on Pier 7 of the Red Hook Marine Terminal in Brooklyn, New York where its headquarters, personnel and administrative staff are located. On Pier 11 of the Red Hook Marine Terminal, Phoenix operates its recycling facility through its affiliate R. Mack, Inc.

### A. The Beer Products

14. Phoenix buys and receives beer products directly from breweries located outside the State of New York. The brewers include Heineken, Miller Coors, Anchor Steam,

Diageo Guinness (Harp, Smithwick's), Desnoes & Geddes (Red Stripe), CCM (Dos Equis, Tecate, Sol), Asahi, Presidente, Brasserie Nationale D'Haiti, S.A., Peroni, Birra Moretti, Pilsner Urquel, Mahou, Scottish and Newcastle, and others. Phoenix has distribution agreements with each of these brewers. In each distribution agreement, the brewer appoints Phoenix as its exclusive distributor in some or all of the five boroughs of New York City and in other counties in New York State.

15. The foreign brewers – e.g., Heineken, Guinness, Harp, Kilkenny, Presidente, Smithwick's, Peroni – ship the beer to the United States, primarily to Port Newark, New Jersey. The beer is shipped in bottles, cans and kegs in shrink-wrapped pallets which are placed in steel containers. Phoenix owns the beer, glass bottles and aluminum can containers once it purchases the beer from the brewers. The kegs and most of the wooden pallets remain the property of the brewer. At Port Newark, longshoremen remove the beer from the cargo ships by crane and place it on trucks owned by contract carriers hired by Phoenix. The contract carriers then transport the beer from New Jersey to Phoenix's Pier 7 warehouse.

16. The Mexican brewers ship their beer, such as Dos Equis, Tecate, and Sol, by truck from Mexico to a warehouse in Laredo, Texas, and then across state lines by rail or truck to either Phoenix's Pier 7 warehouse or to a warehouse in Port Newark, New Jersey. Phoenix owns the beer, glass bottles and aluminum can containers once it purchases the beer from the brewers. The kegs and wooden pallets remain the property of the brewer. If shipped to Port Newark, contract carriers hired by Phoenix pick up the beer and deliver it to Phoenix's Pier 7 warehouse.

17. The domestic brewers, such as Miller Brewing and Anchor Steam, ship the beer across state lines to New York State either by contract truck carriers to Phoenix's Pier 7

warehouse or by rail across state lines to a rail yard in Montgomery, New York. Phoenix owns the beer, glass bottles and aluminum can containers once it purchases the beer from the brewers. The kegs and wooden pallets remain the property of the brewer. At the rail yard, contract carriers hired by Phoenix pick up the beer and deliver it to Phoenix's Pier 7 warehouse.

B. **The Liquor Products**

18. The liquor products also come to Phoenix from outside the State of New York. The largest, Georgi Vodka made by Star Industries, is distilled by Black Prince Distilling in Clifton, New Jersey, and trucked from New Jersey by contract carriers to Phoenix's Pier 7 warehouse. Phoenix owns the vodka and glass bottles once it purchases the vodka from Star Industries. The wooden pallets remain the property of Star Industries.

19. The European (Italian, French and Spanish) wineries ship the wine to the United States, primarily to Port Newark, New Jersey. The wine is shipped in bottles in shrink-wrapped pallets ("Euro-Pallets"). The Euro-Pallets are placed in steel containers. Phoenix owns the wine and glass bottles once it purchases the wine from the wineries. The Euro-Pallets remain the property of the wineries. At Port Newark, longshoremen remove the wine from the ships by crane and place it on trucks owned by contract carriers hired by Phoenix. The contract carriers then transport the wine from New Jersey to Phoenix's Pier 7 warehouse.

C. **The Product at Phoenix's Warehouse**

20. Upon arrival at Phoenix's Pier 7 warehouse, Phoenix's warehousemen break down the product for placement in its temperature-controlled warehouse, by brand, by case, and by keg.

21. The product is pre-sold by Phoenix's salespersons; therefore, the beer and liquor products and their containers stay at Phoenix's warehouse for a very short period of time.

22. Phoenix's warehousemen pick the pre-sold cases and kegs and load them with their pallets on Phoenix's delivery trucks. Phoenix's delivery drivers deliver the product to Phoenix's customers. Depending on the brand and type of container (bottle, can, or keg), most containers leave the warehouse (first in, first out) within 15 days after their arrival, but not longer than 30 days.

### D. The Delivery Drivers

23. Teamsters Local 812 represents Phoenix's delivery drivers and warehousemen under a current collective bargaining agreement ("CBA") with Phoenix and has done so for many years. Local 812's collective bargaining agreements with Phoenix and other beer distributors, and due to the Motor Carrier Act exemption, do not provide for any rights under the Fair Labor Standards Act ("FLSA") for Phoenix's delivery drivers and expressly exempts, and has always expressly exempted, Phoenix's delivery drivers from the overtime and other requirements of the FLSA. In my experience, the Motor Carrier Act exemption has long been the well-known and established practice in those beverage delivery operations, like Phoenix's, where the product moves into New York from out of New York and then back out of New York, albeit in a different form on its way out.

## II. Phoenix Collects, Processes and Ships Across State Lines Empty Product Containers

24. At the same time they deliver product to customers, Phoenix's delivery drivers, including Plaintiffs, also pick up from the customers empty bottles, cans, and kegs, as well as the cardboard cases in which the bottles were delivered, and the wooden pallets.

25. The delivery drivers return the empty cans, bottles, kegs, cardboard cases and wooden pallets to Pier 11 at Phoenix's Red Hook Marine Terminal where Phoenix's owned affiliate R. Mack runs its recycling operation with employees whom Local 812 also represents.

26. The recycling operation includes crushing the glass bottles, crushing the aluminum cans, baling the cardboard cases, and preparing the kegs, pallets, spacers and blankets for their return to the breweries, distilleries and wineries. The recycling operation has five distinct processes, as outlined below. Once the recycling process is complete, all of this material is shipped out of New York State to other states or countries.

A.  **Glass Bottles**

27. The recycling operation crushes the empty bottles into 30-yard dumpsters. This produces approximately five 30-yard glass-filled dumpsters each day. Phoenix sells the crushed glass to EWG Glass Recycling in Jamaica, Queens. The time period in which the empty glass bottles arrive at R. Mack, are crushed and picked up by EWG is one to two days. EWG picks up the dumpsters five times a day and brings them to its glass recycling facility. There, EWG processes the glass by sifting out the caps and labels and then pulverizing the remaining crushed glass into furnace-ready cullets. EWG sells the glass to Owens-Illinois at Owens-Illinois' mills in North Carolina and Pennsylvania, where the glass is melted down and made into new bottles.

28. This continuous preordained interstate movement – i.e., the filled glass containers from out-of-state brewers to Phoenix and from Phoenix to its customers; the pick-up and return of the empty containers by Phoenix from its customers to Phoenix's recycling operation for crushing; the sale of the crushed glass by Phoenix and movement to EWG for further processing; and the resale by EWG and movement to Owens-Illinois' out-of-state mills as the bottles' final destination – has gone through the same cycle for about 30 years, following the enactment of the Bottle Bill (N.Y. Environmental Conservation Law §§ 27-1001 et seq.).

29. Before the shipment of product begins, Phoenix knows its preordained route: that the retriever will be EWG's Glass Recycling facility in Jamaica, Queens and from

there the further processed glass will move to its final destination at Owens Illinois' mills in North Carolina and Pennsylvania.

**B.     Aluminum Cans**

30.     After Phoenix's delivery drivers deliver the empty cans to Pier 11, Phoenix's recycling operation crushes the empty aluminum cans and bales them into 1500-pound bales. In recycling terminology, the bales are referred to as UBC (Used Beverage Containers). The waiting time for empty aluminum can retrieval is generally up to 30 days. Phoenix sells the bales to Alcoa's mill in Maryville, Tennessee and, on occasion, to Alcoa's mill in Kentucky. The bales are trucked from New York State across state lines to Tennessee and Kentucky.

31.     This continuous preordained interstate movement – i.e., the filled aluminum can containers from out-of-state brewers to Phoenix and from Phoenix to its customers; the pick-up and return of the empty containers from its customers to Phoenix's recycling operation for crushing and baling; the sale of the baled aluminum by Phoenix and the movement to Alcoa's out-of-state mills as the cans' final destination – has followed the same cycle for about 30 years, following the enactment of the Bottle Bill.

32.     Before the shipment begins, Phoenix knows its preordained route: that the bales will be sent to Alcoa's mill in Maryville, Tennessee and, on occasion, to Alcoa's mill in Kentucky.

**C.     Cardboard**

33.     When Phoenix's delivery drivers pick up the empty glass bottles from Phoenix's customers, the empty bottles normally are in a cardboard case. Phoenix's delivery drivers deliver the cardboard cases to Pier 11. Phoenix employees bale the cardboard cases into 1200-pound bales. The waiting time for cardboard case retrieval is three to four days. The bales

are then packed into a 40-foot container. A contract carrier hired by Phoenix trucks the containers to a terminal at Port Newark, New Jersey, where they are shipped by contract carrier to India on the average of one load a week.

34. This continuous preordained interstate movement – i.e., the cardboard cases with filled glass containers from out-of-state brewers to Phoenix and from Phoenix to its customers; the pick-up and return of the cardboard cases with empty glass containers by Phoenix from its customers to Phoenix's recycling operation for baling; and the movement to Port Newark, New Jersey for shipping to India as the cardboard cases' final destination – has followed the same cycle for about 30 years, following the enactment of the Bottle Bill.

35. Before the shipment begins, Phoenix knows its preordained route: that the bales will be trucked from New York to New Jersey for ultimate shipping to India.

**D.** **Kegs**

36. Phoenix's delivery drivers also return the empty kegs to the Phoenix recycling operation where Phoenix employees arrange for their return to the applicable brewer. Each keg is branded with the brewer's name. All kegs and returnable pallets remain the property of the brewer. The waiting time for empty kegs retrieval is up to 15 days.

37. The empty Guinness kegs are hand-stacked, honeycomb-style (stacked on their sides), 996 kegs to a 45-foot high cube container, placed in a steel ocean container. The ocean containers are trucked from New York to Maher Terminal in Newark, New Jersey, from where they are shipped back to Guinness in Dublin, Ireland on APL Shipping Lines' vessels. Phoenix does an average return of kegs to Guinness of three ocean containers per week, or approximately 3,000 kegs per week.

38. The empty Heineken kegs are placed on pallets which are put into a 40-foot steel ocean container. Each container contains about 480 kegs, together with 60 Heineken

pallets. The containers are trucked from New York to the Maher Terminal or APM Terminal, both in Newark, New Jersey, for shipment back to the Netherlands. Phoenix does an average return of kegs to Heineken of two ocean containers per week.

39. The empty kegs of the Mexican beers and other foreign beers are packed into in a steel container which is trucked by contract carriers from New York to Kegspediter in Monroe Township, New Jersey. Kegspediter sorts the kegs by destination and then ships them back to the respective out-of-state brewers. Phoenix does an average return of kegs to Kegspediter of one full steel container a week.

40. The empty Miller kegs are placed on trucks at Phoenix and trucked back to Miller's brewery in Eden, North Carolina by contract carriers hired by Phoenix.

41. This continuous preordained interstate movement – i.e., the filled kegs from out-of-state brewers to Phoenix and from Phoenix to its customers; the pick-up and return of empty kegs by Phoenix from its customers to Phoenix's recycling operation where Phoenix's employees prepare the kegs for out-of-state return to each brewer – has followed the same cycle since the inception of Phoenix's business.

42. Phoenix knows the preordained route of each brewers' kegs. In the case of empty kegs of the foreign imports, Phoenix knows that they will move by truck transport from Phoenix's recycling operation at Pier 11 to either the Maher Terminal or the APM Terminal at Port Newark for shipment by sea back to the Netherlands or Ireland or other foreign breweries. In the case of the Mexican beer and all domestic beers, except Miller, Phoenix knows that the empty kegs will move by truck from New York to Kegspediter in Monroe, New Jersey, and from there returned to their applicable out-of-state breweries. In the case of Miller, Phoenix knows

that the empty kegs will be trucked by contract carrier directly from Pier 11 to Miller's brewery in Eden, North Carolina. With kegs, the final destination is always the brewer.

E. **Pallets, Spacers, and Insulating Blankets**

43. The Miller returnable pallets, together with the spacers and blankets which go between the pallets in the incoming loads of full containers, are loaded on the trailers of various contract carriers and trucked from New York to Miller's brewery in Eden, North Carolina.

44. Heineken keg pallets are returned to Heineken along with the empty kegs – i.e., trucked from New York to the Maher or APM Terminal in Newark, New Jersey, and shipped back to the Heineken brewery in the Netherlands from where the filled kegs and pallets originated.

45. The Georgi Vodka pallets are put in a steel container and trucked from New York to Black Prince Distilling in Clifton, New Jersey from where the product originated.

46. The Euro-Pallets are trucked from New York to Port Newark, New Jersey and shipped back to the European wineries from where the product originated.

47. This continuous preordained interstate movement– the product from out-of-state delivered on pallets to Phoenix and on pallets from Phoenix to its customers; the pick-up and return of pallets by Phoenix from its customers to Phoenix's recycling operation where Phoenix's employees stack and prepare the pallets for out-of-state return to the breweries, distilleries and wineries from where they originated – has followed the same cycle since the inception of Phoenix's business.

48. Before the shipment begins, Phoenix knows its preordained route: that the pallets will be trucked across state lines to the breweries, distilleries and wineries from where the product originated.

### III. Phoenix Responded to the U.S. Department of Labor's Inquiry that it Meets the Interstate Commerce Requirement of the Motor Carrier Exemption to the FLSA

49. Last summer, the Wage and Hour Division of the U.S. Department of Labor ("DOL") inquired about "the applicability of the 'Motor Carrier Act exemption' of the Fair Labor Standards Act, found at 29 U.S.C. § 213(b)(1) to the operations of [Phoenix]." (A copy of the DOL's letter to Phoenix's outside counsel, dated August 1, 2012, is attached hereto as Exhibit A.)

50. In response, Phoenix submitted two letters, dated August 8 and August 21, 2012. The August 8 letter makes specific reference to the Second Circuit Court of Appeals decision in *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217 (2d Cir. 2002). (A copy of Phoenix's August 8, 2012 letter to the DOL is attached hereto as Exhibit B.) The August 21 letter describes in detail Phoenix's delivery operations, which are substantively identical to the Dutchess Beer Distributors operations in *Bilyou*, and demonstrates that under *Bilyou*, the Motor Carrier Act exemption of the FLSA, 29 U.S.C. § 213(b)(1), applies to Phoenix's operations. (A copy of Phoenix's August 21, 2012 letter to the DOL is attached hereto as Exhibit C.)

51. Phoenix has received no further inquiries from the DOL.

### IV. Plaintiffs' Weekly Salary Exceeds the Minimum Overtime Requirements Under New York State Law

52. Plaintiffs were or are delivery drivers employed by Phoenix. Phoenix pays its delivery drivers a weekly salary which, each year beginning January 1, 2010, exceeded $900, plus commissions paid based on cases and kegs delivered, plus commissions paid based on empty containers picked up and returned to Pier 11.

53. Under the CBA, there are no weekly hour requirements identified for delivery drivers. Rather, a day's work for a driver and helper is defined as the completion of a minimum load of 500 cases regardless of how long it takes.

54. My understanding is that New York's Minimum Wage Act provides that the minimum hourly rate is $7.25. The weekly salary paid by Phoenix to each Plaintiff far exceeded time and a half of the New York minimum wage for hours worked in excess of forty in a week.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 5/30/13.

_____
RODNEY BRAYMAN