# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

EMMANUEL G. JUSTINIANO, JOSE NIEVES, JOSE BARBOSA, DAHEED WILLIS, ANTHONY KEITT, FRANK FODERA, JOSHUA MOSS, OSCAR PUERTA, LUIS ARENAZA, GUILLERMO MUNOZ, MILTON LAVERDE, WILLIE S. BREWER, ISMAEL FRANCISCO, STEVE M. NG, MANUEL SANTOS, JULIO RIVERA, FREDDY VELEZ, BRYONT A LOPEZ, MIGUEL CABREJA, JUAN VEVAS, TERRENCE JONES, NICOLAS SALGADO, LUIS A. VEGA, LOUIS TELESE, KENNETH WARING, ANTONY G. HILL, JOSE GOMEZ ROSARIO, RODERICK MASHALL, JOSE BLANCO, DAVID BAEZ, KENYA EARLY, SAMMY HERNANDEZ, NELSON MINYETY, BILL DELVIN, EDWIN J. RAMIREZ CESPEDES, BENTO RODRIGUEZ, PAUL STARAPOLA, ANDRES REYES, JESUS A. MARTINEZ, DAVID BEACH, JONATHAN DELROSARIO, JAMES SHAW, GARFIELD GAMMON, DESEAN ALLEN, DERREK HUGHES, JORGE A. MILANES, *and* CARMELO NYANDUGAR, *each individually and on behalf of all other individuals similarly situated,*

|  |  |
|---|---|
| | Case No. 13-CV-2332 (TLS) (JLC) |
| | **DECLARATION OF RODNEY BRAYMAN** |

          Plaintiffs,

   v.

PHOENIX BEVERAGES, INC., WINDMILL DISTRIBUTING COMPANY LP, d/b/a PHOENIX/BEEHIVE, RODB, LLC, LONGFENG TRUCKING, LLC, PHOENIX BEVERAGES MTO, LLC, FORBEE CAPITAL KEG FUND, LLC, HEINEKEN NORTH AMERICA, INC., HEINEKEN USA INCORPORATED, RODNEY BREYMAN, GREGORY BREYMAN, PAUL ROSSI, JOSEPH STANICH, *and* GEORGE STRADA,

          Defendants.

**RODNEY BRAYMAN**[1] declares, pursuant to 28 U.S.C. § 1746, that:

1.      I am the President and Chief Executive Officer ("CEO") of Windmill Distributing Company, LP, d/b/a Phoenix/Beehive ("Windmill"). I have been employed by Windmill for the past forty-five (45) years. I have personal knowledge of the matters set forth herein. I make this declaration in support of Defendants' (collectively "Phoenix" or "Defendants") Motion to Dismiss Plaintiffs' Amended Complaint.

2.      Phoenix is a family-owned business. Its partners and affiliates are all part of the corporate family and do not operate as independent entities. As President and CEO of Windmill, my duties and responsibilities include overseeing the operations of the entire Phoenix corporate family.

3.      Windmill is a general partnership and does business as Beehive in Manhattan and Bronx, New York, and as Phoenix in the rest of New York State.

4.      Defendants Phoenix Beverages, Inc., RODB, LLC and Heineken USA Incorporated are partners of Windmill.

5.      Defendant Long Feng Trucking, LLC is a Windmill affiliate that operates the company's delivery trucks with Phoenix drivers who deliver all the products from Phoenix's warehouse and return the empty bottles, cans, kegs, cardboard cases and pallets to Phoenix's recycling operation.

6.      Defendant Phoenix Beverages MTO, LLC is a Windmill affiliate that leases the company's warehouse space.

7.      Defendant Forbee Capital Keg Fund, LLC is a non-operational corporation owned by Windmill.

---

[1] Incorrectly spelled "Breyman" in the case caption.

8.      Defendant Gregory Brayman, incorrectly spelled "Breyman" in the case caption, is the Vice President of Operations of Windmill.

9.      Defendants Paul Rossi, Joseph Stanich and George Strada are employed as managerial and supervisory warehouse employees of Windmill.

10.     Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is made on behalf of all of the foregoing defendants.

11.     The defendant named as "Heineken North America, Inc." is not an operating company in the beer business and has never been related to Heineken USA Incorporated.

## I.      The Products Phoenix Distributes Within New York State Are Transported Into New York Across State Lines

12.     Phoenix is in the business of distributing alcoholic beverages to its customers located in New York State.  Almost all of the beverages (approximately 95%) are received by Phoenix from out of New York State.  Phoenix is primarily a distributor of beer products, but also distributes wine and spirits (collectively "liquor") products which account for about six percent (6%) of its beverage sales.

13.     Phoenix formerly operated its business on Review Avenue in Queens, New York.  It is now located on Pier 7 of the Red Hook Marine Terminal in Brooklyn, New York where its headquarters, personnel and administrative staff are located.  On Pier 11 of the Red Hook Marine Terminal, Phoenix operates its recycling facility through its affiliate R. Mack, Inc.

### A.      The Beer Products

14.     Phoenix buys and receives beer products directly from breweries located outside the State of New York.  The brewers include Heineken, Miller Coors, Anchor Steam,

Diageo Guinness (Harp, Smithwick's), Desnoes & Geddes (Red Stripe), CCM (Dos Equis, Tecate, Sol), Asahi, Presidente, Brasserie Nationale D'Haiti, S.A., Peroni, Birra Moretti, Pilsner Urquel, Mahou, Scottish and Newcastle, and others.  Phoenix has distribution agreements with each of these brewers.  In each distribution agreement, the brewer appoints Phoenix as its exclusive distributor in some or all of the five boroughs of New York City and in other counties in New York State.

15.     The foreign brewers – e.g., Heineken, Guinness, Harp, Kilkenny, Presidente, Smithwick's, Peroni – ship the beer to the United States, primarily to Port Newark, New Jersey.  The beer is shipped in bottles, cans and kegs in shrink-wrapped pallets which are placed in steel containers.  Phoenix owns the beer, glass bottles and aluminum can containers once it purchases the beer from the brewers.  The kegs and most of the wooden pallets remain the property of the brewer.  At Port Newark, longshoremen remove the beer from the cargo ships by crane and place it on trucks owned by contract carriers hired by Phoenix.  The contract carriers then transport the beer from New Jersey to Phoenix's Pier 7 warehouse.

16.     The Mexican brewers ship their beer, such as Dos Equis, Tecate, and Sol, by truck from Mexico to a warehouse in Laredo, Texas, and then across state lines by rail or truck to either Phoenix's Pier 7 warehouse or to a warehouse in Port Newark, New Jersey.  Phoenix owns the beer, glass bottles and aluminum can containers once it purchases the beer from the brewers.  The kegs and wooden pallets remain the property of the brewer.  If shipped to Port Newark, contract carriers hired by Phoenix pick up the beer and deliver it to Phoenix's Pier 7 warehouse.

17.     The domestic brewers, such as Miller Brewing and Anchor Steam, ship the beer across state lines to New York State either by contract truck carriers to Phoenix's Pier 7

warehouse or by rail across state lines to a rail yard in Montgomery, New York. Phoenix owns

the beer, glass bottles and aluminum can containers once it purchases the beer from the brewers.

The kegs and wooden pallets remain the property of the brewer. At the rail yard, contract

carriers hired by Phoenix pick up the beer and deliver it to Phoenix's Pier 7 warehouse.

**B.      The Liquor Products**

18.     The liquor products also come to Phoenix from outside the State of New

York. The largest, Georgi Vodka made by Star Industries, is distilled by Black Prince Distilling

in Clifton, New Jersey, and trucked from New Jersey by contract carriers to Phoenix's Pier 7

warehouse. Phoenix owns the vodka and glass bottles once it purchases the vodka from Star

Industries. The wooden pallets remain the property of Star Industries.

19.     The European (Italian, French and Spanish) wineries ship the wine to the

United States, primarily to Port Newark, New Jersey. The wine is shipped in bottles in shrink-

wrapped pallets ("Euro-Pallets"). The Euro-Pallets are placed in steel containers. Phoenix owns

the wine and glass bottles once it purchases the wine from the wineries. The Euro-Pallets remain

the property of the wineries. At Port Newark, longshoremen remove the wine from the ships by

crane and place it on trucks owned by contract carriers hired by Phoenix. The contract carriers

then transport the wine from New Jersey to Phoenix's Pier 7 warehouse.

**C.      The Product at Phoenix's Warehouse**

20.     Upon arrival at Phoenix's Pier 7 warehouse, Phoenix's warehousemen

break down the product for placement in its temperature-controlled warehouse, by brand, by

case, and by keg.

21.     The product is pre-sold by Phoenix's salespersons; therefore, the beer and

liquor products and their containers stay at Phoenix's warehouse for a very short period of time.

22.     Phoenix's warehousemen pick the pre-sold cases and kegs and load them with their pallets on Phoenix's delivery trucks.  Phoenix's delivery drivers deliver the product to Phoenix's customers.  Depending on the brand and type of container (bottle, can, or keg), most containers leave the warehouse (first in, first out) within 15 days after their arrival, but not longer than 30 days.

**D.**     **The Delivery Drivers**

23.     Teamsters Local 812 represents Phoenix's delivery drivers and warehousemen under a current collective bargaining agreement ("CBA") with Phoenix and has done so for many years.  Local 812's collective bargaining agreements with Phoenix and other beer distributors, and due to the Motor Carrier Act exemption, do not provide for any rights under the Fair Labor Standards Act ("FLSA") for Phoenix's delivery drivers and expressly exempts, and has always expressly exempted, Phoenix's delivery drivers from the overtime and other requirements of the FLSA.  In my experience, the Motor Carrier Act exemption has long been the well-known and established practice in those beverage delivery operations, like Phoenix's, where the product moves into New York from out of New York and then back out of New York, albeit in a different form on its way out.

**II.**     **Phoenix Collects, Processes and Ships Across State Lines Empty Product Containers**

24.     At the same time they deliver product to customers, Phoenix's delivery drivers, including Plaintiffs, also pick up from the customers empty bottles, cans, and kegs, as well as the cardboard cases in which the bottles were delivered, and the wooden pallets.

25.     The delivery drivers return the empty cans, bottles, kegs, cardboard cases and wooden pallets to Pier 11 at Phoenix's Red Hook Marine Terminal where Phoenix's owned affiliate R. Mack runs its recycling operation with employees whom Local 812 also represents.

26.     The recycling operation includes crushing the glass bottles, crushing the aluminum cans, baling the cardboard cases, and preparing the kegs, pallets, spacers and blankets for their return to the breweries, distilleries and wineries.  The recycling operation has five distinct processes, as outlined below.  Once the recycling process is complete, all of this material is shipped out of New York State to other states or countries.

A.     **Glass Bottles**

27.     The recycling operation crushes the empty bottles into 30-yard dumpsters. This produces approximately five 30-yard glass-filled dumpsters each day.  Phoenix sells the crushed glass to EWG Glass Recycling in Jamaica, Queens.  The time period in which the empty glass bottles arrive at R. Mack, are crushed and picked up by EWG is one to two days.  EWG picks up the dumpsters five times a day and brings them to its glass recycling facility.  There, EWG processes the glass by sifting out the caps and labels and then pulverizing the remaining crushed glass into furnace-ready cullets.  EWG sells the glass to Owens-Illinois at Owens-Illinois' mills in North Carolina and Pennsylvania, where the glass is melted down and made into new bottles.

28.     This continuous preordained interstate movement – i.e., the filled glass containers from out-of-state brewers to Phoenix and from Phoenix to its customers; the pick-up and return of the empty containers by Phoenix from its customers to Phoenix's recycling operation for crushing; the sale of the crushed glass by Phoenix and movement to EWG for further processing; and the resale by EWG and movement to Owens-Illinois' out-of-state mills as the bottles' final destination – has gone through the same cycle for about 30 years, following the enactment of the Bottle Bill (N.Y. Environmental Conservation Law §§ 27-1001 et seq.).

29.     Before the shipment of product begins, Phoenix knows its preordained route: that the retriever will be EWG's Glass Recycling facility in Jamaica, Queens and from

there the further processed glass will move to its final destination at Owens Illinois' mills in North Carolina and Pennsylvania.

**B.**     **Aluminum Cans**

30.     After Phoenix's delivery drivers deliver the empty cans to Pier 11, Phoenix's recycling operation crushes the empty aluminum cans and bales them into 1500-pound bales.  In recycling terminology, the bales are referred to as UBC (Used Beverage Containers).  The waiting time for empty aluminum can retrieval is generally up to 30 days.  Phoenix sells the bales to Alcoa's mill in Maryville, Tennessee and, on occasion, to Alcoa's mill in Kentucky.  The bales are trucked from New York State across state lines to Tennessee and Kentucky.

31.     This continuous preordained interstate movement – i.e., the filled aluminum can containers from out-of-state brewers to Phoenix and from Phoenix to its customers; the pick-up and return of the empty containers from its customers to Phoenix's recycling operation for crushing and baling; the sale of the baled aluminum by Phoenix and the movement to Alcoa's out-of-state mills as the cans' final destination – has followed the same cycle for about 30 years, following the enactment of the Bottle Bill.

32.     Before the shipment begins, Phoenix knows its preordained route: that the bales will be sent to Alcoa's mill in Maryville, Tennessee and, on occasion, to Alcoa's mill in Kentucky.

**C.**     **Cardboard**

33.     When Phoenix's delivery drivers pick up the empty glass bottles from Phoenix's customers, the empty bottles normally are in a cardboard case.  Phoenix's delivery drivers deliver the cardboard cases to Pier 11.  Phoenix employees bale the cardboard cases into 1200-pound bales.  The waiting time for cardboard case retrieval is three to four days.  The bales

are then packed into a 40-foot container.  A contract carrier hired by Phoenix trucks the containers to a terminal at Port Newark, New Jersey, where they are shipped by contract carrier to India on the average of one load a week.

34.     This continuous preordained interstate movement – i.e., the cardboard cases with filled glass containers from out-of-state brewers to Phoenix and from Phoenix to its customers; the pick-up and return of the cardboard cases with empty glass containers by Phoenix from its customers to Phoenix's recycling operation for baling; and the movement to Port Newark, New Jersey for shipping to India as the cardboard cases' final destination – has followed the same cycle for about 30 years, following the enactment of the Bottle Bill.

35.     Before the shipment begins, Phoenix knows its preordained route: that the bales will be trucked from New York to New Jersey for ultimate shipping to India.

**D.     Kegs**

36.     Phoenix's delivery drivers also return the empty kegs to the Phoenix recycling operation where Phoenix employees arrange for their return to the applicable brewer. Each keg is branded with the brewer's name.  All kegs and returnable pallets remain the property of the brewer.  The waiting time for empty kegs retrieval is up to 15 days.

37.     The empty Guinness kegs are hand-stacked, honeycomb-style (stacked on their sides), 996 kegs to a 45-foot high cube container, placed in a steel ocean container.  The ocean containers are trucked from New York to Maher Terminal in Newark, New Jersey, from where they are shipped back to Guinness in Dublin, Ireland on APL Shipping Lines' vessels. Phoenix does an average return of kegs to Guinness of three ocean containers per week, or approximately 3,000 kegs per week.

38.     The empty Heineken kegs are placed on pallets which are put into a 40-foot steel ocean container.  Each container contains about 480 kegs, together with 60 Heineken

-9-

pallets.  The containers are trucked from New York to the Maher Terminal or APM Terminal, both in Newark, New Jersey, for shipment back to the Netherlands.  Phoenix does an average return of kegs to Heineken of two ocean containers per week.

39.     The empty kegs of the Mexican beers and other foreign beers are packed into in a steel container which is trucked by contract carriers from New York to Kegspediter in Monroe Township, New Jersey.  Kegspediter sorts the kegs by destination and then ships them back to the respective out-of-state brewers.  Phoenix does an average return of kegs to Kegspediter of one full steel container a week.

40.     The empty Miller kegs are placed on trucks at Phoenix and trucked back to Miller's brewery in Eden, North Carolina by contract carriers hired by Phoenix.

41.     This continuous preordained interstate movement – i.e., the filled kegs from out-of-state brewers to Phoenix and from Phoenix to its customers; the pick-up and return of empty kegs by Phoenix from its customers to Phoenix's recycling operation where Phoenix's employees prepare the kegs for out-of-state return to each brewer – has followed the same cycle since the inception of Phoenix's business.

42.     Phoenix knows the preordained route of each brewers' kegs.  In the case of empty kegs of the foreign imports, Phoenix knows that they will move by truck transport from Phoenix's recycling operation at Pier 11 to either the Maher Terminal or the APM Terminal at Port Newark for shipment by sea back to the Netherlands or Ireland or other foreign breweries. In the case of the Mexican beer and all domestic beers, except Miller, Phoenix knows that the empty kegs will move by truck from New York to Kegspediter in Monroe, New Jersey, and from there returned to their applicable out-of-state breweries.  In the case of Miller, Phoenix knows

that the empty kegs will be trucked by contract carrier directly from Pier 11 to Miller's brewery in Eden, North Carolina. With kegs, the final destination is always the brewer.

### E.   Pallets, Spacers, and Insulating Blankets

43.   The Miller returnable pallets, together with the spacers and blankets which go between the pallets in the incoming loads of full containers, are loaded on the trailers of various contract carriers and trucked from New York to Miller's brewery in Eden, North Carolina.

44.   Heineken keg pallets are returned to Heineken along with the empty kegs – i.e., trucked from New York to the Maher or APM Terminal in Newark, New Jersey, and shipped back to the Heineken brewery in the Netherlands from where the filled kegs and pallets originated.

45.   The Georgi Vodka pallets are put in a steel container and trucked from New York to Black Prince Distilling in Clifton, New Jersey from where the product originated.

46.   The Euro-Pallets are trucked from New York to Port Newark, New Jersey and shipped back to the European wineries from where the product originated.

47.   This continuous preordained interstate movement– the product from out-of-state delivered on pallets to Phoenix and on pallets from Phoenix to its customers; the pick-up and return of pallets by Phoenix from its customers to Phoenix's recycling operation where Phoenix's employees stack and prepare the pallets for out-of-state return to the breweries, distilleries and wineries from where they originated – has followed the same cycle since the inception of Phoenix's business.

48.   Before the shipment begins, Phoenix knows its preordained route: that the pallets will be trucked across state lines to the breweries, distilleries and wineries from where the product originated.

**III.**   **Phoenix Responded to the U.S. Department of Labor's Inquiry that it Meets the**
**Interstate Commerce Requirement of the Motor Carrier Exemption to the FLSA**

49.     Last summer, the Wage and Hour Division of the U.S. Department of

Labor ("DOL") inquired about "the applicability of the 'Motor Carrier Act exemption' of the

Fair Labor Standards Act, found at 29 U.S.C. § 213(b)(1) to the operations of [Phoenix]."  (A

copy of the DOL's letter to Phoenix's outside counsel, dated August 1, 2012, is attached hereto

as Exhibit A.)

50.     In response, Phoenix submitted two letters, dated August 8 and August 21,

2012.  The August 8 letter makes specific reference to the Second Circuit Court of Appeals

decision in *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217 (2d Cir. 2002).  (A copy of

Phoenix's August 8, 2012 letter to the DOL is attached hereto as Exhibit B.)  The August 21

letter describes in detail Phoenix's delivery operations, which are substantively identical to the

Dutchess Beer Distributors operations in *Bilyou*, and demonstrates that under *Bilyou*, the Motor

Carrier Act exemption of the FLSA, 29 U.S.C. § 213(b)(1), applies to Phoenix's operations.  (A

copy of Phoenix's August 21, 2012 letter to the DOL is attached hereto as Exhibit C.)

51.     Phoenix has received no further inquiries from the DOL.

**IV.**   **Plaintiffs' Weekly Salary Exceeds the Minimum Overtime Requirements Under**
**New York State Law**

52.     Plaintiffs were or are delivery drivers employed by Phoenix.  Phoenix

pays its delivery drivers a weekly salary which, each year beginning January 1, 2010, exceeded

$900, plus commissions paid based on cases and kegs delivered, plus commissions paid based on

empty containers picked up and returned to Pier 11.

53.     Under the CBA, there are no weekly hour requirements identified for

delivery drivers.  Rather, a day's work for a driver and helper is defined as the completion of a

minimum load of 500 cases regardless of how long it takes.

54.     My understanding is that New York's Minimum Wage Act provides that the minimum hourly rate is $7.25.  The weekly salary paid by Phoenix to each Plaintiff far exceeded time and a half of the New York minimum wage for hours worked in excess of forty in a week.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 5/30/13 .

RODNEY BRAYMAN

# EXHIBIT A

**U.S. Department of Labor**      Office of the Solicitor
201 Varick Street
New York, New York 10014



Reply to the Attention of:      SOL:JC
(646) 264-3667

August 1, 2012

Eugene T. D'Ablemont, Esq.
Kelley, Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Dear Mr. D'Ablemont:

Re: Beehive Beer Distributors/ a division of Windmill Distributing LP d/b/a Phoenix
Beverages

This letter follows up our phone conversation of last week. In keeping with that
conversation, the Wage and Hour Division is requesting information from your clients in
the above investigation. This information is being requested for the purposes of
evaluating the applicability of the "Motor Carrier Act exemption" of the Fair Labor
Standards Act, found at 29 U.S.C. § 213(b)(1) to the operations of your clients. The
information being requested is as follows:

1. What is the name of the business entity (or entities) that picks up and transports
   the bottle glass and the empty kegs from the warehouse?
2. Are the entities that pick up the bottle glass and empty kegs from the warehouse
   affiliated with Windmill Distributing LP?
3. What is the typical waiting time between the arrival of a batch/shipment/pallet of
   bottle glass at the warehouse and its retrieval? The same question applies to
   empty kegs
4. What are the destinations (name of recipient, city, and state/country) of the bottle
   glass and the empty kegs? We are not seeking destinations for particular batches
   or shipments. We are asking for the destinations where the bottle glass and empty
   kegs have generally been sent to after the pick-up from the warehouse.
5. Does Windmill Distributing LP know the destination of the
   batches/shipments/pallets of bottle glass before or at the time they are retrieved
   from the warehouse? If yes, how does Windmill know the destination?
6. Does Windmill Distributing LP know the destination of the
   batches/shipments/pallets of the empty kegs before or at the time they are
   retrieved from the warehouse? If yes, how does Windmill know the destination?

The time period covered by these questions is August 1, 2009 to the present.

Thank you for your assistance in this regard.

Sincerely,

Patricia M. Rodenhausen
Regional Solicitor

By:

John G. Campbell
Counsel for Wage and Hour

# EXHIBIT B

**KELLEY DRYE & WARREN LLP**

A LIMITED LIABILITY PARTNERSHIP

**101 PARK AVENUE**

**NEW YORK, NY 10178**

(212) 808-7800

WASHINGTON, DC
LOS ANGELES, CA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ

BRUSSELS, BELGIUM

AFFILIATE OFFICE
MUMBAI, INDIA

FACSIMILE
(212) 808-7897
www.kelleydrye.com

EUGENE T. D'ABLEMONT
DIRECT LINE: (212) 808-7830
EMAIL: edablemont@kelleydrye.com

August 8, 2012

John C. Campbell, Esq.
Counsel for Wage and Hour
U.S. Department of Labor
Office of the Solicitor
201 Varick Street
New York, NY 10014

ATTN: SOL:JC

Re:   Beehive Beer Distributors/a division of Windmill Distributing, LP
      d/b/a Phoenix Beverages

Dear Mr. Campbell:

        I have your letter, dated August 1, 2012, which was mailed out by regular mail on August 2, 2012, and arrived here on August 7.

        Your first sentence states that the letter follows up our phone conversation of last week. Actually, we had chatted on July 17, 2012 about the application to Phoenix's beer delivery operations of the Second Circuit Court of Appeals' decision in Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d 217 (2d Cir. 2002) to which I had referred in my letter to Ms. Evelyn Ortiz-Mills of the U.S. DOL, Wage and Hour Division, dated April 23, 2012. After we discussed the facts of how Phoenix's beer operations worked, I asserted that Phoenix's operations essentially mirrored those of Dutchess Beer Distributor ("DBD") as set forth in the Second Circuit's decision.

        I then said that if you needed substantiation of my representations to please send me a letter setting forth with specificity what the DOL needed. Your August 1 letter followed.

**KELLEY DRYE & WARREN LLP**

John C. Campbell, Esq.
August 8, 2012
Page Two


Phoenix will certainly provide you with the information you seek.  The only question is timing, due to vacation scheduling.  We will do so as soon as practicable.

Sincerely,

Eugene T. D'Ablemont

ETD:pnr

Westlaw.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
(Cite as: 300 F.3d 217)

▷

United States Court of Appeals,
Second Circuit.
Michael BILYOU, individually & on behalf of others
similarly situated, Plaintiff–Appellant,
v.
DUTCHESS BEER DISTRIBUTORS, INC., Defendant–Appellee.

Docket No. 01–7378.
Argued: Feb. 1, 2002.
Decided: Aug. 7, 2002.

Former delivery route driver for wholesale beverage distributor sued former employer under Fair Labor Standards Act (FLSA) and state law for overtime pay. The United States District Court for the Southern District of New York, Colleen McMahon, J., 2001 WL 286779, entered summary judgment for employer. Employee appealed. The Court of Appeals, Leval, Circuit Judge, held that: (1) employer satisfied interstate commerce requirement of motor carrier exemption to FLSA; (2) fact that employer's primary business was wholesaling rather than transportation did not deprive Secretary of Jurisdiction of authority to regulate employer's qualifications and maximum hours; and (3) employer's alleged noncompliance with Department of Transportation (DOT) regulations did not preclude application of motor carrier exemption.

Affirmed.

West Headnotes

[1] Labor and Employment 231H ⬅️2251

231H Labor and Employment
　231HXIII Wages and Hours
　　231HXIII(B) Minimum Wages and Overtime
Pay
　　　231HXIII(B)3 Exemptions
　　　　231Hk2251 k. Strict or liberal construction of exemptions. Most Cited Cases
　　　　(Formerly 232Ak1192 Labor Relations)

Exemptions to the FLSA are narrowly construed against the employers seeking to assert them and their application is limited to those establishments plainly and unmistakably within their terms and spirit. Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

[2] Labor and Employment 231H ⬅️2385(6)

231H Labor and Employment
　231HXIII Wages and Hours
　　231HXIII(B) Minimum Wages and Overtime
Pay
　　　231HXIII(B)6 Actions
　　　　231Hk2383 Evidence
　　　　　231Hk2385 Presumptions and Burden of Proof
　　　　　　231Hk2385(5) Exemptions
　　　　　　　231Hk2385(6) k. In general.
Most Cited Cases
　　　(Formerly 232Ak1516 Labor Relations)

Burden of invoking FLSA exemptions rests upon the employer. Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

[3] Labor and Employment 231H ⬅️2290(1)

231H Labor and Employment
　231HXIII Wages and Hours
　　231HXIII(B) Minimum Wages and Overtime
Pay
　　　231HXIII(B)3 Exemptions
　　　　231Hk2285 Carriers
　　　　　231Hk2290 Motor Carriers' Employees
　　　　　　231Hk2290(1) k. In general.
Most Cited Cases
　　　(Formerly 232Ak1240 Labor Relations)

Even if a carrier's transportation does not cross state lines, the interstate commerce requirement of the motor carrier exemption to the FLSA is satisfied if the goods being transported within the borders of one State are involved in a practical continuity of movement in the flow of interstate commerce. Fair Labor Standards Act of 1938, §§ 7, 13(b)(1), 29

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
**(Cite as: 300 F.3d 217)**

U.S.C.A. §§ 207, 213(b)(1); 49 U.S.C.A. §§ 13102(13), 13501, 31502(b)(2).

**[4]** Labor and Employment 231H ☞2290(1)

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)3 Exemptions
            231Hk2285 Carriers
               231Hk2290 Motor Carriers' Employees
                  231Hk2290(1) k. In general. Most Cited Cases
     (Formerly 232Ak1240 Labor Relations)

For purposes of satisfying interstate commerce requirement of motor carrier exemption to FLSA, whether transportation is of an interstate nature can be determined by reference to the intended final destination of the transportation when that ultimate destination was envisaged at the time the transportation commenced. Fair Labor Standards Act of 1938, §§ 7, 13(b)(1), 29 U.S.C.A. §§ 207, 213(b)(1); 49 U.S.C.A. §§ 13102(13), 13501, 31502(b)(2).

**[5]** Labor and Employment 231H ☞2290(4)

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)3 Exemptions
            231Hk2285 Carriers
               231Hk2290 Motor Carriers' Employees
                  231Hk2290(4) k. Drivers. Most Cited Cases
     (Formerly 232Ak1240 Labor Relations)

Wholesale beverage distributor's role in collecting, transporting and exporting empty containers was part of continuous movement of goods in interstate commerce, for purposes of determining applicability of motor carrier exemption to FLSA; although driver's carriage of empties took place entirely within New York, it was merely one leg of route to out-of-state destination. Fair Labor Standards Act of 1938, § 13(b)(1), 29 U.S.C.A. § 213(b)(1); 49 U.S.C.A. §§ 13102(13), 13501(1)(A), 31502(b)(2).

**[6]** Automobiles 48A ☞111

48A Automobiles
   48AIII Public Service Vehicles
      48AIII(C) Regulation of Operation and Management
         48Ak111 k. Conduct of business in general. Most Cited Cases

**Automobiles 48A ☞116**

48A Automobiles
   48AIII Public Service Vehicles
      48AIII(C) Regulation of Operation and Management
         48Ak116 k. Employees and contractors. Most Cited Cases

**Automobiles 48A ☞136**

48A Automobiles
   48AIV License and Regulation of Chauffeurs or Operators
      48Ak135 License and Registration
         48Ak136 k. In general. Most Cited Cases

Motor Carrier Act provision denying Secretary of Transportation power to prescribe economic and licensing regulations over transportation furthering a primary business other than transportation in no way contradicts Secretary's authority, established in different part of Act, to set qualifications and maximum hours of service for drivers to promote safety of operations. 49 U.S.C.A. §§ 13505, 31502.

**[7]** Labor and Employment 231H ☞2290(3)

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)3 Exemptions
            231Hk2285 Carriers
               231Hk2290 Motor Carriers' Employees
                  231Hk2290(3) k. Particular employees in general. Most Cited Cases
     (Formerly 232Ak1238 Labor Relations)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
(Cite as: 300 F.3d 217)

Wholesale beverage distributor's alleged non-compliance with Department of Transportation (DOT) regulations relating to registration, operating authorization, and logging driver hours, did not preclude application of motor carrier exemption to FLSA. Fair Labor Standards Act of 1938, §§ 7, 13(b)(1), 29 U.S.C.A. §§ 207, 213(b)(1).

[8] Labor and Employment 231H ⟶2290(1)

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)3 Exemptions
                231Hk2285 Carriers
                    231Hk2290 Motor Carriers' Employees
                        231Hk2290(1) k. In general.
Most Cited Cases
    (Formerly 232Ak1238 Labor Relations)

Motor carrier exemption to FLSA overtime requirement applies regardless whether the Secretary of Transportation has exercised his authority to regulate a particular employee or employer. Fair Labor Standards Act of 1938, §§ 7, 13(b)(1), 29 U.S.C.A. §§ 207, 213(b)(1).

*218 Dan Getman, Getman & Selcov, LLP, New Paltz, NY, for Plaintiff–Appellant.

John P. Hannigan, Bleakley Platt & Schmidt, LLP (Matthew G. Parisi on the brief), White Plains, NY, for Defendant–Appellee.

Before: LEVAL, CALABRESI, Circuit Judges, and STEIN, District Judge.[FN*]

    FN* The Honorable Sidney H. Stein, of the United States District Court for the Southern District of New York, sitting by designation.

LEVAL, Circuit Judge.
Plaintiff Michael Bilyou ("Bilyou") appeals from a judgment of the United States District Court for the Southern District of New York (Colleen McMahon, *Judge* ) granting summary judgment to defendant-employer and dismissing plaintiff's claim for over-

time pay under the Fair *219 Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*[FN1] Plaintiff is a former delivery driver for defendant Dutchess Beer Distributors, Inc. ("DBD"), a wholesale beverage distributor located in Poughkeepsie, New York. Plaintiff sued DBD for unpaid overtime allegedly accrued during the course of his employment. The district court ruled that he was subject to the authority of the United States Secretary of Transportation with respect to his qualifications and maximum hours of service and thus exempt from the overtime requirement of the FLSA. We affirm the judgment denying plaintiff's claim under the FLSA.

    FN1. The amended complaint also included claims under New York law based on New York Labor Law Articles 6 and 19, and perhaps also contract. Upon dismissing the federal law claim, the district court declined to exercise supplemental jurisdiction with respect to the state law claims.

**BACKGROUND**

*A. Facts*

Bilyou worked as a delivery route driver for DBD from June 1986 to January 1999, when he was terminated for cause. He claims that during the course of his employment he regularly worked more than 40 hours per week and is thus entitled under the FLSA to overtime pay at the rate of one and one-half times his regular rate of pay.

Pursuant to a license from the United States Bureau of Alcohol, Tobacco, and Firearms, DBD is permitted to receive, sell, and deliver malted beverages in interstate commerce. DBD distributes beer and other beverages to retail outlets in the Hudson Valley region. Ninety-eight percent of its business is beer, and the rest is water and wine cooler products. Its customers include bars, restaurants, convenience stores, delis, supermarkets, and beer and soda discount centers. DBD has more than 1800 customers, all located within the State of New York. Between 1995 and 1997, the company grossed more than $23,000,000 in sales per year.

DBD runs its distribution operation primarily out of a processing center in Poughkeepsie, New York, but it also maintains a warehouse in Kingston, New York. Next to DBD's center in Poughkeepsie is a recycling facility operated by Mid–Hudson Alumi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
**(Cite as: 300 F.3d 217)**

num Can Recycling, Inc. ("Mid–Hudson"). Mid–Hudson is owned by the owners of DBD. Mid–Hudson's facility, which is located on the same parcel of property as DBD's, processes exclusively DBD products. DBD uses portions of Mid–Hudson's facility for office and storage space. DBD and Mid–Hudson lease the property from a real estate holding company that is owned by the owners of DBD and Mid–Hudson.

DBD obtains most of its inventory from out-of-state suppliers and breweries. It receives products from breweries in New York, New Jersey, New Hampshire, Texas, California, Pennsylvania, Mexico, Germany, and Canada. DBD's main supplier of beer products is Anheuser–Busch ("AB"), which provides about 85 percent of its inventory. DBD is the exclusive AB distributor in the Hudson Valley distribution area. The vast majority of AB products are shipped to DBD's processing center in Poughkeepsie from breweries in Newark, New Jersey and Merrimack, New Hampshire. AB's main office in St. Louis, Missouri is connected by an electronic communication system to DBD's Poughkeepsie facility, enabling AB to monitor daily the amount and distribution of its products delivered to DBD's customers. If DBD delivers AB products to a retailer in the morning, AB knows by that afternoon *220 exactly what type of product and how much has been delivered. Based on this daily sales information, AB determines the amounts and types of products to ship to DBD. AB also communicates directly with several of DBD's customers, informing them of promotions and advertisements, but all customers place orders with and make payments to DBD.

DBD's basic business operation is as follows: Products are delivered daily from breweries, mostly out of state, to DBD's processing center. DBD takes title to the products upon delivery at its processing center or warehouse. Approximately 25 to 30 tractor trailer loads of products are received each week. DBD arranges to receive products from most out-of-state breweries through "third-party contract haulers." DBD's own drivers do not transport the products from supplying breweries. The products have not been designated for a final retailer at the time of delivery. Most products arrive at the warehouse in shrink-wrapped stacked pallets, and are then organized and divided in DBD's temperature controlled facility by container, brand, and flavor. DBD's stor-

age time for beer products varies from two weeks to one month. DBD generally keeps an inventory on hand worth between $2–2.2 million.

DBD utilizes its own sales staff. Retail customers place orders directly with DBD. After receiving orders from customers, DBD prepares a load sheet for each of its route drivers. The route drivers load their trucks according to the load sheets and deliver the products to various customers. All of DBD's deliveries occur within the State of New York. Distribution areas include Dutchess, Ulster, Greene, Columbia and Delaware counties.

Upon making product deliveries, DBD route drivers collect empty product containers ("empties") from customers and transport them to either DBD's Kingston facility or Mid–Hudson's facility in Poughkeepsie. Empties include aluminum cans, glass and plastic containers, and returnable or refillable containers such as empty barrels, bottles, and pallets. Route drivers like Bilyou, who drive out of the Poughkeepsie facility, deliver all collected empties to Mid–Hudson Drivers working out of the Kingston warehouse return aluminum empties to the Kingston facility, and other empties to Mid–Hudson Most of the empties are taken to the Mid–Hudson facility.

As to the glass empties, Mid–Hudson purchases them from DBD, crushes them, and then sells them to different suppliers. Mid–Hudson makes all arrangements for the shipment or pick-up of the crushed glass, and purchasers of the glass pay Mid–Hudson directly. Mid–Hudson ships out or arranges the pick-up of the crushed glass in tractor trailers to Connecticut or Pennsylvania about three times a week. Mid–Hudson also processes plastic empties, refillable and returnable containers, and some of the aluminum empties. As to the aluminum empties, Mid–Hudson purchases them from DBD, crushes them and sells them, and sends them to Connecticut approximately three times per month.

Mid–Hudson also packages the returnable containers and loads them onto trailers in preparation for their return to the brewery. AB is generally the only vendor to whom returnable containers are sent on a regular basis. AB sends DBD preprinted invoices for the return of refillable empties, designating DBD as the sender of the empties. DBD pays an advance deposit for the refillable empties, and it recoups be-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
**(Cite as: 300 F.3d 217)**

tween $20,000 and $30,000 in monthly credit upon returning the containers. Several tractor trailers of refillable empties are returned to the breweries each week. DBD contracts with a third party hauler, *221 North–Bergen Transport, Inc., which picks up the loaded trailers and drops them off at an out-of-state brewery.

Some of the aluminum empties are also taken to DBD's Kingston facility, where they are flattened and loaded onto a trailer to be picked up by Reynolds Aluminum. Reynolds purchases the processed aluminum empties from DBD and takes them to a recycling plant in Connecticut.

*B. Proceedings Below*

In June 1999, Bilyou brought this suit against DBD on behalf of himself and other similarly situated DBD drivers. The amended complaint sought unpaid overtime pay under the FLSA and Articles 6 and 19 of New York's Labor Law. The district court entered summary judgment in favor of DBD on the basis of the "motor carrier exemption" to the FLSA. *See Bilyou v. Dutchess Beer Distributors, Inc.,* 2001 WL 286779 (S.D.N.Y. Mar.9, 2001). It found that DBD was a private motor carrier subject to the authority of the Secretary of Transportation (the "Secretary") to establish qualifications and maximum hours of service for covered employees under the Motor Carrier Act of 1935 ("MCA"), 49 U.S.C. § 31502. Because employees subject to the Secretary's power are exempt from the overtime requirements of the FLSA, 29 U.S.C. § 213(b)(1), the court held that Bilyou was not entitled to overtime compensation.

Bilyou made two arguments challenging the Secretary's authority to regulate qualifications and maximum hours of service for DBD's drivers. First, he claimed that DBD was not subject to the Secretary's authority under 49 U.S.C. § 31502 because it was not engaged in *interstate* transportation as specified in 49 U.S.C. § 13501. The court rejected this argument because even though DBD's delivery routes were intrastate, including both new merchandise and empties, DBD carried goods that were in the course of interstate shipment. *Bilyou,* 2001 WL 286779 at *3–4.

Bilyou also contended that DBD was exempted from the Secretary's authority by 49 U.S.C. § 13505(a)(2), which deprives the Secretary of jurisdic-

tion "over the transportation of property by motor vehicle when ... the transportation ... furthers a primary business (other than transportation) of the person." Bilyou argued that DBD's "primary business" is beer wholesaling, not transportation. The district court rejected this argument, finding that DBD's primary business was transportation. *Bilyou,* 2001 WL 286779, at *5. The court concluded that DBD was subject to regulation by the Secretary of Transportation and was thus exempt from the overtime standards of the FLSA, 29 U.S.C. § 207. The court dismissed Bilyou's federal claim under the FLSA and declined to exercise supplemental jurisdiction over the state claims. This appeal followed.

## DISCUSSION

On appeal, Bilyou raises three main challenges to the district court's decision that the motor carrier exemption relieved DBD from the FLSA's overtime requirements. He contends first that the delivery routes of DBD drivers are not "between a place in a State and a place in another State," with the consequence that the Secretary lacks jurisdiction to regulate DBD. *See* 49 U.S.C. § 13501(1)(A). Second, Bilyou argues that because DBD's motor vehicle transportation "furthers a primary business (other than transportation)," the Secretary is prohibited by 49 U.S.C. § 13505 from regulating DBD drivers. Finally, he claims that DBD's failure to comply with several Department of Transportation ("DOT") regulations estops it from *222 invoking the Secretary's authority to regulate it.

[1][2] At the outset, we recognize that exemptions to the FLSA are "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). The burden of invoking these exemptions rests upon the employer. *Id.* at 394 n. 11, 80 S.Ct. 453; *see also Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 614 (2d Cir.1991). We conclude nonetheless that the Secretary of Transportation has the power to establish qualifications and maximum hours of service for DBD's drivers pursuant to the Motor Carrier Act, 49 U.S.C. § 31502, and that DBD's drivers are therefore exempt from the overtime requirements of the FLSA.

## I. The Application of the Motor Carrier Exemp-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
**(Cite as: 300 F.3d 217)**

**tion to DBD**

The FLSA requires employers to pay overtime wages to certain employees who work more than forty hours in a week. It provides, in pertinent part:

Maximum hours

(a) Employees engaged in interstate commerce ...

(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207. This provision does not apply, however, to employees for whom the Secretary of Transportation may prescribe requirements for qualifications and maximum hours of service under 49 U.S.C. § 31502. The FLSA states:

b) The provisions of section 207 of this title shall not apply with respect to—

(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49.

29 U.S.C. § 213(b)(1).[FN2]

> FN2. Congress enacted the MCA, Pub.L. No. 74–255, 49 Stat. 543 (1935), three years before the passage of the FLSA, to promote efficiency and safety in interstate motor transportation. The Act empowered the Interstate Commerce Commission ("ICC") to "establish reasonable requirements with respect to qualifications and maximum hours of service of employees and safety of operation and equipment" of motor vehicles operating as common, contract, or private motor carriers. _Levinson v. Spector Motor Service_, 330 U.S. 649, 658, 67 S.Ct. 931, 91 L.Ed. 1158 (1947). In 1966, Congress enacted the

"Department of Transportation Act," which transferred the authority to regulate safety operations for motor vehicles under the MCA from the ICC to the Department of Transportation. See Pub.L. No. 89–670, 80 Stat. 931, 939–40, § 6(e)(6)(C); _Friedrich v. U.S. Computer Servs._, 974 F.2d 409, 412 (3d Cir.1992). Congress abolished the ICC on January 1, 1996 and transferred many of its functions to the newly created Surface Transportation Board, an agency within the Department of Transportation. See ICC Termination Act of 1995, Pub.L. No. 104–88, § 101, 109 Stat. 803, 804 (1995).

Pursuant to its authority under the MCA, the

Secretary of Transportation may prescribe requirements for ... qualifications and maximum hours of service of employees of, and standards of equipment*223 of, a motor private carrier, when needed to promote safety of operation.

49 U.S.C. § 31502(b)(2).
A "motor private carrier" is defined as

a person, other than a motor carrier, transporting property by motor vehicle when—

(A) the transportation is as provided in section 13501 of this title;

(B) the person is the owner, lessee, or bailee of the property being transported; and

(C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(13). DBD is a "person ... transporting property by motor vehicle." It is not a "motor carrier," in that it does not carry for compensation. See § 13102(12) ("The term 'motor carrier' means a person providing motor vehicle transportation for compensation."). DBD is "the owner ... of the property being transported," and "the property is being transported for sale ... or to further a commercial enterprise." 49 U.S.C. § 13102(13). DBD thus fits perfectly within the definition of a motor private carrier, if the transportation it performs is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
**(Cite as: 300 F.3d 217)**

"as provided in § 13501" of title 49.

Section 13501 gives the Secretary jurisdiction over transportation by motor carrier if, *inter alia,* passengers or property are transported by motor carrier

(1) between a place in—

(A) a State and a place in another State;

(B) a State and another place in the same State through another State; ...

49 U.S.C. § 13501.

**II. DBD Satisfies the Interstate Commerce Requirement of the Motor Carrier Exemption to the FLSA**

[3] Bilyou contends that DBD's carriage of goods does not conform to the requirements of 49 U.S.C. § 13501. He argues it is not "between ... a State and a place in another State." Even if a carrier's transportation does not cross state lines, the interstate commerce requirement is satisfied if the goods being transported within the borders of one State are involved in a "practical continuity of movement" in the flow of interstate commerce. *Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 568, 63 S.Ct. 332, 87 L.Ed. 460 (1943); *see also Atlantic Coast Line R. Co. v. Standard Oil Co. of Kentucky,* 275 U.S. 257, 267–69, 48 S.Ct. 107, 72 L.Ed. 270 (1927); *Project Hope v. M/V Ibn Sina,* 250 F.3d 67, 74 (2d Cir.2001) (noting in the Carmack Amendment context, which is also governed by the interstate commerce requirement of 49 U.S.C. § 13501, "The nature of a shipment is ... determined ... by the essential character of the commerce, reflected by the intention formed prior to shipment, pursuant to which the property is carried to a selected destination by a continuous or unified movement.") (quotation marks and citations omitted); *Foxworthy v. Hiland Dairy Co.,* 997 F.2d 670, 672 (10th Cir.1993) ("Transportation within a single state may remain 'interstate' in character when it forms a part of a 'practical continuity of movement' across state lines from the point of origin to the point of destination.") (citation omitted); *Reich v. American Driver Serv., Inc.,* 33 F.3d 1153, 1155 n. 3 (9th Cir.1994) (wholly intrastate commerce satisfies interstate requirement when part of "continuing transportation"); 29 C.F.R. § 782.7(b)(1) (interstate com-

merce requirement satisfied "where the vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce").

[4] Whether the transportation is of an interstate nature can be "determined by *224 reference to the intended final destination" of the transportation when that ultimate destination was envisaged at the time the transportation commenced. *Project Hope,* 250 F.3d at 74; *see also Atlantic Coast Line,* 275 U.S. at 269, 48 S.Ct. 107 (determining continuity of transportation by examining whether the destination of the goods "is arranged for or fixed in the minds of the sellers"); *Klitzke v. Steiner Corp.,* 110 F.3d 1465, 1469 (9th Cir.1997) ("Whether transportation is interstate or intrastate is determined by the essential character of the commerce, *manifested by shipper's fixed and persisting transportation intent at the time of the shipment.* ...") (citation omitted) (emphasis in original); *Foxworthy,* 997 F.2d at 672 ("Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment.") (quotation marks and citation omitted); 29 C.F.R. § 782.7(b)(2) (intrastate transportation can satisfy the interstate commerce requirement of the MCA if the shipper has a "fixed and persisting transportation intent beyond the terminal storage point at the time of shipment"). The intent at the time transportation commences "fixes the character of the shipment for all the legs of the transport within the United States." *Project Hope,* 250 F.3d at 75.

[5] DBD asserts that two aspects of its business operation satisfy the interstate commerce requirement: 1) its distribution within New York State of out-of-state products; and 2) its collection and out-of-state export of empty containers. We agree that DBD's operation involving the transportation of empties is part of the flow of interstate commerce, and therefore find it unnecessary to determine whether DBD's intrastate distribution of out-of-state products also meets the interstate commerce requirement.

In the course of delivering products to retail customers, Bilyou regularly picked up glass, plastic, and aluminum empties, as well as refillable containers, and carried them to Mid-Hudson's facility in Poughkeepsie for further shipment several times a week to destinations outside the State. Although Bilyou's carriage of the empties took place entirely within the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
(Cite as: 300 F.3d 217)

State of New York, his carriage was merely one leg of a route to an out-of-state destination. His segment of the transportation of those empties was part of the interstate movement of goods. *See Jacksonville Paper, 317 U.S. at 568, 63 S.Ct. 332* ("A temporary pause in the[ ] transit [of goods] does not mean that they are no longer 'in commerce'.... [I]f the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points."). We agree with the district court's determination that Bilyou's involvement in this process was part of a continuous movement of goods in interstate commerce. *Cf. Foxworthy, 997 F.2d at 674* (the pick-up and deposit of empty milk crates at a distribution center that were then shipped to an out-of-state processing plant exempted employee drivers from FLSA overtime provisions); *Opelika Royal Crown Bottling Co. v. Goldberg, 299 F.2d 37, 41–42 (5th Cir.1962)* (distributor's pick-up and return of empties to out-of-state brewery is part of the interstate movement of goods, where it is clear from the moment of pick-up that the empties have an intended final destination to a specific out-of-state brewery).

Bilyou argues that DBD's handling of the empties is not part of an interstate shipment because it is Mid–Hudson, not DBD, that processes the empties and arranges for their out-of-state shipment. Assuming Bilyou's argument might be valid if Mid–Hudson were an independent **225 entity that purchased the empties at arm's length from DBD, that is not the case. Mid–Hudson and DBD are related entities and are not in an arm's length relationship to one another. They have common owners, share the same property, and arrange with one another the allocation of the benefits and burdens of handling the empties. For example, as to the returnable and refillable containers, while Mid–Hudson packages and loads them onto trailers, it is DBD that receives a credit from Anheuser–Busch for their return.

Mid–Hudson neither purchases those refillable empties from DBD, nor does it receive payment from AB. The district court found that AB "sends DBD 'preprinted invoices' for the shipment of returns; the amount DBD is credited for the return is exactly the same as the amount DBD pre-paid for deposits on the same product when it was originally shipped for distribution." 2001 WL 286779 at *4. These invoices

designate DBD as the sender of the refillable containers. Furthermore, the refillable empties are transported from Mid–Hudson's facility to out-of-state breweries by a third-party shipper with whom DBD has contracted. Thus, from the moment it receives these products, DBD has a "fixed and persisting intent" to return the refillable containers to out-of-state breweries. *See Project Hope, 250 F.3d at 74; 29 C.F.R. § 782.7(b)(2).*

We have considered Bilyou's remaining arguments contesting DBD's involvement in interstate commerce, and we find them to be without merit. We conclude that DBD's role in the process of collecting, transporting, and exporting empty containers is part of the continuous movement of those goods in interstate commerce, and that the requirement of 49 U.S.C. § 13501(1)(A) is therefore satisfied. DBD thus satisfies all of the criteria for the application of § 31502(b)(2), and consequently of the motor carrier exemption under the FLSA, 29 U.S.C. § 213(b)(1).

**III. 49 U.S.C. § 13505 Does Not Deprive the Secretary of Transportation of Authority to Regulate Bilyou's Qualifications and Maximum Hours**

Attempting to defeat the application of section 31502 of Title 49, Bilyou argues that under 49 U.S.C. § 13505 the Secretary of Transportation is deprived of jurisdiction over DBD because DBD's "primary business" is wholesaling, rather than transportation. The same argument has been presented to two other circuits; both have rejected it. *See Klitzke v. Steiner, 110 F.3d 1465, 1468 (9th Cir.1997); Friedrich v. U.S. Computer Servs., 974 F.2d 409, 413 (3d Cir.1992); see also Carpenter v. Pennington Seed, Inc., 2002 WL 465176, *3–*4 (E.D.La. Mar.26, 2002).* We reject it also.

Bilyou's reading is not supported by the text of the statutes or their history. Section 13505 provides

(a) ... Neither the Secretary [of Transportation] nor the [Surface Transportation] Board has jurisdiction under this part over the transportation of property by motor vehicle when—

(1) the property is transported by a person engaged in a business other than transportation; and

(2) the transportation is within the scope of, and furthers a primary business (other than transporta-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
(Cite as: 300 F.3d 217)

tion) of the person.

49 U.S.C. § 13505. Bilyou contends that because DBD is primarily a wholesaler of beer and other beverages, rather than a transporter, this provision exempts it from DOT's authority and renders inapplicable the motor carrier exemption to the FLSA. While his argument has a superficial appeal,*226 it does not withstand a careful reading of the statutes.

Bilyou is correct that § 13505 covers DBD, because DBD's transportation is in furtherance of a primary business other than transportation—the beer and beverage wholesaling business. But the remainder of Bilyou's argument falters. On the basis of DBD's involvement in another primary business other than transportation, § 13505 exempts it from the Secretary's jurisdiction, as specified *in this part,* over transportation of property by motor vehicle." 49 U.S.C. § 13505 (emphasis added). Section 13505 is a provision of Part B of Subtitle IV of Title 49, 49 U.S.C. §§ 13101–14914. That Part contains provisions authorizing the DOT to enact registration and security (insurance and bonding) requirements for motor carriers, freight forwarders, and brokers. *See* 49 U.S.C. § 13902 (registration requirements for motor carriers); § 13903 (registration requirements for freight forwarders); § 13904 (registration requirements for brokers); *see also* § 13906 (bonding and insurance requirements for motor carriers, freight forwarders, and brokers).[FN3]

> FN3. These provisions do not purport to provide DOT with any authority to impose registration or security requirements on domestic motor private carriers. *See Klitzke,* 110 F.3d at 1468; *Friedrich,* 974 F.2d at 413. Sections 13902(e) and 13906(a)(2) do empower the DOT to impose registration and certain security requirements on "foreign motor private carriers," which are defined under § 13102(7) to include only a "person (including a motor private carrier but excluding a motor carrier of property) ... that is domiciled in a contiguous foreign country; or that is owned or controlled by persons of a contiguous foreign country." No reference is made, however, to domestic motor private carriers.

[6] Section 13505 has no bearing on the Secre-

tary's power, as described in 29 U.S.C. § 213(b)(1), "to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." Section 31502 falls under a different part of Title 49. It falls in Part B of Subtitle VI relating to "Motor Vehicle and Driver Programs." The fact that § 13505 denies the Secretary power to prescribe economic and licensing regulations of the sort covered in Subtitle IV, Part B, in no way contradicts the Secretary's authority, established in a different part of the Motor Carrier Act, to set qualifications and maximum hours of service for drivers to promote safety of operations. That is the crucial inquiry under FLSA's § 213(b)(1), and, as shown above, DBD satisfies those criteria.[FN4]

> FN4. Furthermore, if one were to read § 13505, as Bilyou does, to bar the Secretary of Transportation from establishing qualifications and maximum hours of service for businesses like DBD, it would place §§ 13505 and 31502 in a peculiar headlong conflict. Sections 13505 and 31502(b)(2) each prescribe a rule for the same kinds of business—those that transport property by motor vehicle in furtherance of a primary business other than the business of transportation. Section 31502(b)(2) says of such a business that the Secretary "may prescribe requirements for qualifications and maximum hours of service ... when needed to promote safety of operation." Meanwhile, section 13505 would mean, according to Bilyou's argument, that the Secretary may not. At the time Congress passed § 13505, had it intended to nullify § 31502(b)(2), the logical step would have been simply to repeal § 31502(b)(2), rather than leaving it standing and passing a new statute saying the opposite, leaving on the books two statutory provisions contradicting one another.

This understanding of the different purposes of §§ 13505 and 31502 is confirmed by a brief exploration of the history and purpose of precursor provisions in the MCA. The MCA originally contemplated three categories of motor carriers: common, contract, and private. Common and contract carriers were known as "for-hire" carriers. *See* *227 *United States v. Drum,* 368 U.S. 370, 374, 82 S.Ct. 408, 7 L.Ed.2d 360 (1962). Common carriers offered transportation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
(Cite as: 300 F.3d 217)

for property and passengers "for the general public," while contract carriers arranged transportation services by contract. *See* 49 Stat. 543–67, § 203(a)(14)-(15); *see also Mercury Motor Express, Inc. v. United States*, 648 F.2d 315, 317 (5th Cir.1981). Private carriers transported property of which they were the "owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise." 49 Stat. 543–67, § 203(a)(17).

Since the time of its passage, the MCA has endowed the Interstate Commerce Commission with the power to impose economic regulations such as licensing, certificate, and permit requirements on common and contract carriers, but not on private carriers. *See* 49 Stat. 543, 551–52, §§ 206, 209; *Drum*, 368 U.S. at 375, 82 S.Ct. 408 (1962) (under the MCA, a "shipper is free to transport his own goods without utilizing a regulated instrumentality," but may not use "for compensation or for-hire transportation purchased from a person not licensed" by the ICC); *Amer. Trucking Ass'n, Inc. v. Interstate Commerce Comm'n*, 672 F.2d 850, 851 (11th Cir.1982). However, while private carriers were exempt from the economic and licensing regulations established by the MCA, the ICC retained the authority under that Act to prescribe safety of operation requirements relating to maximum hours and qualifications of their employees. *See* 49 Stat. 546, § 204(a); [FN5] *Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 46, 63 S.Ct. 917, 87 L.Ed. 1244 (1943) (noting that all carrier employees are "subject to regulation to promote safety of operation under § 204(a)(3)"); *Levinson*, 330 U.S. at 658, 67 S.Ct. 931; *Keller Indus., Inc. v. United States*, 449 F.2d 163, 171 (5th Cir.1971) ("Under the [Motor Carrier] Act, a private carrier is exempt from economic (but not safety) regulation."); Frederick M. Porter, *Federal Regulation of Private Carriers*, 64 Harv.L.Rev. 896, 900 (1951) ("Private transportation of goods by motor vehicle is specifically recognized in the Interstate Commerce Act and is exempted from all regulation by the ICC, except for compliance with certain safety provisions of the Act.").

FN5. It shall be the duty of the Commission—

(1) To regulate common carriers by motor vehicle as provided in this part, and to that end the Commission may establish rea-

sonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.

(2) To regulate contract carriers by motor vehicle as provided in this part, and to that end the Commission may establish reasonable requirements with respect to uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.

(3) To establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment. 49 Stat. 546, § 204(a); 49 U.S.C. § 304(a) (repealed).

In order to evade licensing and economic regulations imposed on for-hire transportation, common and contract carriers engaged in deceptive schemes, designed to convert them into unlicensed private carriers. For example, for-hire carriers often entered "buy-sell" arrangements, through which they ostensibly purchased the goods to be transported from the shipper and then sold them to the consignee. Under such schemes, carriers claimed to be shipping *228 their own goods, so as to qualify as private carriers, avoiding ICC rate and licensing requirements as well as payment of federal excise taxes. *See Red Ball Motor Freight, Inc. v. Shannon*, 377 U.S. 311, 313, 84 S.Ct. 1260, 12 L.Ed.2d 341 (1964); *Friedrich*, 974 F.2d at 413; *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1373 n. 4 (11th Cir.1983); H.R. Rep. 85–1922, 1958 U.S.C.C.A.N. 3456, 3474 (1958) ("This pseudo-private carriage is a subterfuge for engaging in public transportation without complying with the certificate or permit requirements of the Interstate Commerce Act ... It makes possible the avoidance of payment of the federal transportation of property tax, for this tax is not levied on the transportation of property owned by the carrier.").

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
**(Cite as: 300 F.3d 217)**

Congress responded to these evasion schemes in 1957 and 1958 by adopting amendments to the MCA designed to make such evasion more difficult. *See* Pub.L. No. 85–163, 71 Stat. 411 (1957); Pub.L. No. 85–625, 72 Stat. 574 (1958); <sup>FN6</sup> *see also Red Ball, 377 U.S. at 313–14, 84 S.Ct. 1260.* Adopting a test developed initially for this purpose by the ICC, Congress enacted the precursor of § 13505, prohibiting the unlicensed transportation of property in commerce unless "within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person." These amendments were "designed explicitly to authorize the ICC to eliminate transportation which, though carried on in the guise of private carriage, was in effect for-hire carriage, and thus might lawfully be carried on only by an authorized common or contract carrier." *Red Ball, 377 U.S. at 313, 84 S.Ct. 1260.* The "primary business" test was designed to distinguish between transportation legitimately in furtherance of a different business, which could lawfully be carried on unlicensed, from carriage for pay disguised by sham buy-sell arrangements. Although the amendments provided a new test for private carriage, they did not change the basic statutory framework of the MCA: the ICC's authority to impose certification and licensing requirements remained limited to for-hire carriers, but the ICC continued to be authorized to prescribe regulations for the safety of operation, including the qualifications and maximum hours of employees, for all carriers, including private carriers.

FN6. Certificate or permit; transportation within scope, and in furtherance, of primary business enterprise.

....

[N]o person shall engage in any for-hire transportation business by motor vehicle, in interstate or foreign commerce, on any public highway or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such person a certificate or a permit issued by the Commission authorizing such transportation, nor shall any person engaged in any other business enterprise transport property by motor vehicle in interstate or foreign commerce for business purposes unless such transportation is within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person. § 203(c). Codified at 49 U.S.C. § 303(c) (repealed).

Congress has amended the statute embodying the "primary business" test in insignificant ways a number of times, eventually resulting in § 13505 on which Bilyou relies. Like the other courts to have considered that question, *see Klitzke, 110 F.3d at 1468; Friedrich, 974 F.2d at 413,* we conclude that it continues to serve its original purpose of supplying the test to determine whether a carrier is subject to the licensing and certification regulations originally imposed by the ICC on common and contract carriers. At the same time, it continues to have no bearing on the prescription of qualifications and maximum hours of service for employees to ensure safety, which the ICC was authorized to *229 regulate for private carriers as well as common and contractual carriers. The DOT, having received the former ICC's responsibility to regulate, *see supra* note 2, continues to exercise the power to prescribe qualifications and maximum hours of service of employees (at least when needed to promote safety of operation) for a motor private carrier, as well as for a common carrier, regardless whether its transportation is a furtherance of a primary business other than transportation.

We also note that notwithstanding § 13505, the DOT construes 49 U.S.C. § 31502 to authorize it to regulate the safety of operation, including qualifications and maximum hours of service of employees, of all motor carriers, including motor private carriers which transport in furtherance of a primary non-transportation business. *See, e.g.,* 49 C.F.R. Pt. 391 (qualifications); 49 C.F.R. Pt. 395 (hours).

Accordingly, we conclude that the Secretary of Transportation "has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49," for Bilyou's employment by DBD, and for that reason, pursuant to the motor carrier's exemption of the FLSA, 29 U.S.C. § 213(b)(1), the wage and hours provisions of § 207 of Title 29 do not apply to his employment.

**IV. DBD's Non–Compliance with Certain DOT Regulations Does Not Preclude Application of the**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793
(Cite as: 300 F.3d 217)

**Motor Carrier Exemption**

[7] Finally, Bilyou claims that DBD should be estopped from arguing that it is subject to the Secretary of Transportation's authority, as it has failed to comply with DOT regulations, including requirements relating to registration, operating authorization, and logging driver hours. We disagree.

[8] The motor carrier exemption of the FLSA applies to "any employee with respect to whom the Secretary of Transportation *has power* to establish qualifications and maximum hours of service." 29 U.S.C. § 213(b)(1) (emphasis added). Courts have consistently held that the § 213(b)(1) exemption to § 207 applies regardless whether the Secretary of Transportation has exercised his authority to regulate a particular employee or employer. *See, e.g., Levinson, 330 U.S. at 661, 67 S.Ct. 931* ("the Commission's mere possession of that power, whether exercised or not, necessarily excluded all employees, with respect to whom the power existed, from the benefits of the compulsory overtime provisions" of the FLSA); *Martin v. Coyne Int'l Enter. Corp., 966 F.2d 61, 63 (2d Cir.1992)* (holding that the department's failure to regulate particular drivers does not mean that it lacks the power to do so); *see also* 48 Am.Jur.2d Labor and Labor Relations § 4125 (1994), Overtime Pay Exemption Under the FLSA ("It is not necessary for an employer to apply for or obtain a certificate of exemption from the DOT Secretary in order to be entitled to the FLSA exemption. If the DOT Secretary has control over the motor carrier's operations, its employees are within the exemption regardless of the fact that the carrier is not exercising its permit to carry on interstate operations.") (citations omitted). Section 207 remains inapplicable regardless whether DOT has acted to regulate DBD's activities and regardless whether DBD has observed or evaded those regulations.

**CONCLUSION**

We affirm the district court's grant of *230 summary judgment.[FN7]

FN7. The Clerk is authorized to tax costs.

C.A.2 (N.Y.),2002.
Bilyou v. Dutchess Beer Distributors, Inc.
300 F.3d 217, 146 Lab.Cas. P 34,576, 7 Wage & Hour Cas.2d (BNA) 1793

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT C

## KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP

**101 PARK AVENUE**

**NEW YORK, NY  10178**

(212) 808-7800

WASHINGTON, DC
LOS ANGELES, CA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ
———
BRUSSELS, BELGIUM
———
AFFILIATE OFFICE
MUMBAI, INDIA

FACSIMILE
(212) 808-7897
www.kelleydrye.com

EUGENE T. D'ABLEMONT
DIRECT LINE: (212) 808-7830
EMAIL: edablemont@kelleydrye.com

August 21, 2012

**VIA FEDERAL EXPRESS OVERNIGHT MAIL
AND REGULAR MAIL**

John C. Campbell, Esq.
Counsel for Wage and Hour
U.S. Department of Labor
Office of the Solicitor
201 Varick Street
New York, NY  10014

ATTN: SOL:JC

     Re:    Beehive Beer Distributors/a division of Windmill Distributing, LP
            d/b/a Phoenix Beverages ("Phoenix")

Dear Mr. Campbell:

     Pursuant to my letter to you, dated August 8, 2012, this letter provides the information you requested in your letter to me, dated August 1, 2012.

     First, before setting forth that information in isolation, I believe it is important to place it in the proper background perspective.

### PHOENIX

     Phoenix is primarily a distributor of beer products which it buys and receives directly from breweries located outside the State of New York.[1]  The brewers include Heineken, Miller Brewing, Guinness, Anchor Steam, Diageo (Harp, Smithwick's), Desnoes & Geddes (Red

---

[1]    Phoenix also buys and distributes wine and spirits (collectively "liquor") products which account for about six (6%) percent of its beverage sales.  These products also come to Phoenix from outside the State of New York, with the largest Georgi Vodka being distilled in Clifton, New Jersey, and trucked from there to Phoenix.

**KELLEY DRYE & WARREN** LLP

John C. Campbell, Esq.
August 21, 2012
Page Two

Stripe), CCM (Dos Equis, Tecate, Sol), Asahi, Presidente, Brasserie Nationale D'Haiti, S.A., Peroni, Birra Moretti, Pilsner Urquel, Mahou, Scottish and Newcastle, and others. Phoenix has distribution agreements with each of these brewers which appoints Phoenix as its exclusive distributor within certain counties of New York and the five boroughs of New York City.

The beer from the foreign brewers, Heineken, Guinness, Harp, Kilkenny, Red Stripe, Presidente, Smithwicke, Peroni, etc. arrives by ship in bottles, cans and kegs in bubble-wrapped pallets. The pallets are in steel containers which longshoremen remove from the cargo ships by crane and place on flat-bed trucks owned by contract trucking companies. The ships dock for the most part at Port Newark in New Jersey. The contract carriers then transport the beer from New Jersey to Phoenix's warehouse, formerly located on Review Avenue in the Borough of Queens and now located on Pier 7 of the Red Hook Marine Terminal in the Borough of Brooklyn where Phoenix's headquarters personnel and administrative staff are also located.

Title to the beer, including the glass bottles and aluminum can containers, but not the kegs and pallets which remain the property of the brewer, passes from the brewer to Phoenix at Phoenix's Pier 7 warehouse. Phoenix's warehousemen then break-down the beer for placement in its temperature-controlled warehouse, by brand, by case, and by keg. The same procedure applies to the domestic brewers Miller Brewing and Anchor Steam and to the Mexican brewers of Dos Equis, Tecate, and Sol. The domestic beer is shipped by rail across state lines to a rail yard where contract carrier trucking companies pick it up and deliver it to Phoenix's Pier 7 warehouse where title passes. The Mexican beer is transported by truck from Mexico to the United States and then across state lines to Phoenix's Pier 7 warehouse where title passes.

The beer is pre-sold by Phoenix's salespersons. The warehousemen pick the sold brand cases and kegs and load them with their pallets on Phoenix's beer delivery trucks for delivery to Phoenix's retail customers. Teamsters Local 812 represents the delivery drivers and warehousemen under a current collective bargaining agreement ("CBA") with Phoenix and has done so for many years. The drivers deliver the beer to Phoenix's retail customers and at the same time pick up from the customers empty product containers consisting of empty bottles, cans, and kegs. The drivers will also pick up the cardboard boxes, in which the bottles were delivered, and pallets.

The drivers will then transport the empty cans, bottles, kegs, cardboard containers and pallets back to the Red Hook Marine Terminal, but to Pier 11 where Phoenix's owned affiliate R. Mack runs a recycling operation with employees whom Local 812 represents. This operation breaks itself down into four distinct processes, as follows:

**KELLEY DRYE & WARREN LLP**

John C. Campbell, Esq.
August 21, 2012
Page Three


## Glass Bottles

The bottles are crushed into 30 yard dumpsters. This produces approximately five 30 yard glass filled dumpsters each day. Phoenix sells the crushed glass to EWG's Glass Recycling facility in Jamaica, Queens. EWG picks up the dumpsters five times a day and brings them to its Glass Recycling facility. There, EWG further processes the glass by sifting out the caps and labels and then pulverizing the remaining crushed glass into furnace-ready cullets. EWG sells the glass to Owens-Illinois at Owens-Illinois' mills in North Carolina and Pennsylvania where the glass is melted down and made into new bottles. This same predestined continuous interstate movement of filled glass containers from out-of-state brewers to Phoenix; from Phoenix to its customers and pick-up of the empty containers by Phoenix from its customers for movement to Phoenix's recycling operation for crushing; the sale of the crushed glass by Phoenix and movement to EWG for further processing; and the resale by EWG and movement to Owens-Illinois' out-of-state mills as the bottles' final destination, has gone through this same cycle week after week, year after year, following the enactment of the Bottle Bill.


## Aluminum Cans

Here again the empty beer can containers are picked up by the delivery drivers from Phoenix's customers at the time of delivery of filled containers and returned by Phoenix's delivery trucks to Phoenix's recycling operation on Pier 11. There, Phoenix employees crush the cans and bale them into bales of 1500 pounds each. In recycling terminology the bales are referred to as UBC (Used Beverage Containers). Phoenix sells the bales to Alcoa's mill in Maryville, Tennessee and, on occasion, to Alcoa's mill in Kentucky. Here again, this continuous interstate movement of filled and empty aluminum cans is predestined at the time of shipping from the out-of-state brewers to Phoenix; the delivery from Phoenix to its customers by beer truck delivery drivers; and, the pick-up by Phoenix drivers from the customers at the time of delivery of empty beer can containers; and the return of the empty cans by Phoenix's delivery trucks to Pier 11 where Phoenix crushes them for movement to Alcoa's out-of-state mills as the cans' final destination.


## Cardboard

When the empty glass bottles are picked up by the delivery drivers from Phoenix's customers, the bottles normally are in the original case (cardboard box). Here again, the delivery drivers deliver the cardboard boxes to Pier 11 where Phoenix employees bale the cardboard into 1200 pound bales. The bales then get packed into what is known as a 40 foot "ocean container." A contract carrier then trucks the containers to a terminal at Port Newark, New Jersey, where they get shipped to India on the average of one load a week.

**KELLEY DRYE & WARREN** LLP

John C. Campbell, Esq.
August 21, 2012
Page Four

## Kegs

The beer delivery drivers deliver the filled kegs from Pier 7 to Phoenix's customers, pick up the empties at the time of delivery, and return the empty kegs to Pier 11 where Phoenix employees arrange for their return to the applicable brewer. Each keg is branded with the brewer's name. Each distribution agreement provides expressly that "all kegs and returnable pallets" will remain the property of the brewer.

In the case of Guinness, the empty kegs are hand-stacked, honeycomb-style (stacked on their sides) 996 kegs to a 45 foot high cube, placed in a steel container, which is brought to Maher Terminal in Newark, New Jersey, and shipped back to Guinness in Dublin, Ireland on APL Shipping Lines' vessels. Phoenix does an average return of kegs to Guinness of three filled containers per week or 2,988 kegs a week.

In the cast of Heineken, the empty kegs are placed on pallets which are put into a 40 foot steel ocean container. Each container contains about 480 kegs, together with 60 Heineken pallets. The containers are then trucked to the Maher Terminal or APM Terminal, both in Newark, New Jersey, for shipment back to Holland. Phoenix does an average of two ocean containers per week.

In the case of the Mexican beers and Newcastle, Anchor Steam, Pilsner Urquell, Peroni, Moretti, Red Stripe, Presidente, etc., their empty kegs are packed into in a steel container which is loaded on a contract carrier's trailer on pallets and driven to Kegspediter in Monroe Township, New Jersey. Kegspediter sorts the kegs by destination and then ships them back to the respective out-of-state or out-of-country brewers. Phoenix does about one full steel container a week.

In the case of Miller Brewing, the empty kegs are placed on trailers at Pier 11 and trucked back to Miller's brewery in Eden, North Carolina.

With kegs, there is a predestined continuous circular interstate movement of each brewer's kegs coming to Phoenix's Pier 7 warehouse from out-of-state breweries; the kegs' delivery from Pier 7 to Phoenix's customers by Phoenix's beer delivery trucks driven by Phoenix drivers, and the pick-up of empty kegs by the same drivers and return to Pier 11 where Phoenix's employees prepare the kegs for out-of-state or out-of-country return to each brewer in one continuous flow of kegs from the original point of shipment to the predestined final destination, to wit: the original point of shipment.

KELLEY DRYE & WARREN LLP

John C. Campbell, Esq.
August 21, 2012
Page Five

### Pallets, Spacers, and Insulating Blankets

In the case of Miller Brewing, the returnable pallets, together with the spacers and blankets which go between the pallets in the incoming loads of full containers, are loaded on the trailers of various contract truck carriers and returned to the Miller brewery in Eden, North Carolina.

In the case of Heineken, keg pallets are returned to Heineken along with the empty kegs; trucked to the Maher or APM Terminal in Newark, New Jersey, and shipped back to the Heineken brewery in Holland from where the filled kegs and pallets originated.

In the case of Star Industries (Georgi Vodka), the pallets are put in a steel container and returned to Black Prince Distilling in Clifton, New Jersey from where the product originated. Here again, the product is delivered from out-of-state to Phoenix's warehouse at Pier 7 on pallets; pre-sold; placed on delivery trucks on pallets for delivery to Phoenix's customers; and the pallets returned by the delivery trucks to Pier 11, and there stacked and returned to Star's facility in Clifton, New Jersey, by contract carrier.

In the case of Euro-Pallets, on which Italian Wines arrived at Pier 7 from the various wineries in Italy through Port Newark, New Jersey, the pallets are returned to the Italian wineries through Port Newark once the product has been sold.

### ANSWERS TO SPECIFIC INFORMATION REQUESTED

1.      Long Feng Trucking Company is the Phoenix owned affiliate that operates the beer delivery trucks with Phoenix drivers who deliver all the brewers' products from Phoenix's warehouse on Pier 7 at the Red Hook Marine Terminal to Phoenix's customers and at the time of delivery pick up the customers' empty containers ("empties"), consisting of glass bottles, aluminum cans, and kegs and cardboard and pallets and return them to Phoenix's recycling operation on Pier 11 at the Red Hook Marine Terminal.

EWG buys the crushed glass and picks it up at Pier 11 for transport to its Glass Recycling facility in Jamaica, Queens, where the crushed glass is further processed and resold and transported to Owen-Illinois' mills in North Carolina and Pennsylvania where the glass is melted down and made into new bottles.

2.      There are no empty glass bottles, aluminum cans or empty kegs in the warehouse on Pier 7 where all the filled beer containers are located in a temperature controlled facility. Phoenix's owned affiliate Long Feng Trucking, with Phoenix drivers, delivers all the

NY01\DAbIE\1578399.1

### KELLEY DRYE & WARREN LLP

John C. Campbell, Esq.
August 21, 2012
Page Six

filled containers from the warehouse to Phoenix's customers and at the time of delivery picks-up empty bottles, cans and kegs and returns them to Phoenix's recycling operation on Pier 11.

EWG Glass Recycling picks up the crushed glass from Pier 11. Contract carriers pick up the crushed aluminum cans for direct delivery to Alcoa. Contract carriers pick up the empty kegs at Pier 11 and, depending on the brewer, contract carriers deliver the empty kegs of the foreign brewers to the Maher or APM Terminal at Port Newark for shipment back to Holland, Ireland, Italy; in the case of the Mexican beers and domestic beers, other than Miller, the empty kegs are moved from Pier 11 by contract carrier to Kegspediter in Monroe, New Jersey and from there moved back to their out-of-state or country brewer. In the case of Miller, the empty kegs are moved by contract carrier to Miller's brewery in Eden, North Carolina. None of the contract carriers is affiliated with Phoenix or any affiliate of Phoenix.

3.      Beer has a shelf life. Depending on the brand and type of container (bottle, can, or keg), most filled containers leave the warehouse (first in, first out) within 15 days after their arrival, but not longer than 30 days.

The waiting time for empty bottle glass' arrival at Pier 11 and retrieval by EWG is one to two days. The waiting time for cardboard retrieval is three to four days. The waiting time for empty kegs retrieval is up to 15 days. The waiting time for empty aluminum cans retrieval is up to 30 days.

4.      See above under the headings Glass Bottles, Aluminum Cans, Cardboard, Kegs, Pallets, Spacers and Insulating Blankets.

5.      Yes, before the times the empty glass bottles are crushed and retrieved at Pier 11. In the case of crushed glass, Phoenix knows that the retriever will be EWG's Glass Recycling facility in Jamaica, Queens and from there the further processed glass will move to its final destination at Owens Illinois' mills in North Carolina and Pennsylvania. Phoenix knows that predestined route of a shipment before the shipment begins.

6.      Yes, before the empty kegs are retrieved at Pier 11. In the case of empty kegs of the foreign imports, Phoenix knows that they will move by truck transport from Pier 11 to either the Maher Terminal or the APM Terminal at Port Newark for shipment by sea back to Holland or Ireland or other foreign breweries. In the case of the Mexican beer and all domestic beer, except Miller, Phoenix knows that the empty kegs will move by truck to Kegspediter in Monroe, New Jersey, and from there returned to their applicable out-of-state or out-of-country breweries. In the case of Miller, Phoenix knows that the empty kegs will be trucked by contract carrier directly from Pier 11 to Miller's brewery in Eden, North Carolina. With kegs, the final destination is always the brewer.

**KELLEY DRYE & WARREN LLP**

John C. Campbell, Esq.
August 21, 2012
Page Seven


       7.     Yes, <u>before</u> the time the empty aluminum cans are crushed and retrieved at Pier 11. Before crushing the aluminum cans into bales, Phoenix knows that the bales will be sent to Alcoa's mill in Maryville, Tennessee and, on occasion, to Alcoa's mill in Kentucky. The out-of-state Alcoa mills are, and have long been the known final destination of the crushed cans.

       I believe that answers your questions and more. If you have any questions or wish additional information, please feel free to contact me.

                         Sincerely,

                         Eugene T. D'Ablemont

ETD:JJ

cc: Angelo Sgro, Director of Human Resources