# Exhibit 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

EMMANUEL G. JUSTINIANO, JOSE NIEVES, JOSE BARBOSA, DAHEED WILLIS, ANTHONY KEITT, FRANK FODERA, JOSHUA MOSS, OSCAR PUERTA, LUIS ARENAZA, GUILLERMO MUNOZ, MILTON LAVERDE, WILLIE S. BREWER, ISMAEL FRANCISCO, STEVE M. NG, MANUEL SANTOS, JULIO RIVERA, FREDDY VELEZ, BRYONT A LOPEZ, MIGUEL CABREJA, JUAN VEVAS, TERRENCE JONES, NICOLAS SALGADO, LUIS A. VEGA, LOUIS TELESE, KENNETH WARING, ANTONY G. HILL, JOSE GOMEZ ROSARIO, RODERICK MASHALL, JOSE BLANCO, DAVID BAEZ, KENYA EARLY, SAMMY HERNANDEZ, NELSON MINYETY, BILL DELVIN, EDWIN J. RAMIREZ CESPEDES, BENTO RODRIGUEZ, PAUL STARAPOLA, ANDRES REYES, JESUS A. MARTINEZ, DAVID BEACH, JONATHAN DELROSARIO, JAMES SHAW, GARFIELD GAMMON, DESEAN ALLEN, DERREK HUGHES, JORGE A. MILANES, *and* CARMELO NYANDUGAR, *each individually and on behalf of all other individuals similarly situated*,

            Plaintiffs,

    v.

PHOENIX BEVERAGES, INC., WINDMILL DISTRIBUTING COMPANY LP, d/b/a PHOENIX/BEEHIVE, RODB, LLC, LONGFENG TRUCKING, LLC, PHOENIX BEVERAGES MTO, LLC, FORBEE CAPITAL KEG FUND, LLC, HEINEKEN NORTH AMERICA, INC., HEINEKEN USA INCORPORATED, RODNEY BREYMAN, GREGORY BREYMAN, PAUL ROSSI, JOSEPH STANICH, *and* GEORGE STRADA,

            Defendants.

Case No. 13-CV-2332 (TLS) (JLC)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................... 1

FACTUAL STATEMENT .............................................................................................................. 1

I.      Plaintiffs' Allegations ......................................................................................................... 1

II.     Phoenix's Business .............................................................................................................. 2

        A.      The Products Phoenix Distributes Within New York State Are
                Transported Into New York Across State Lines .............................................. 3

                1.      The Beer Products ........................................................................... 3

                2.      The Liquor Products ........................................................................ 4

                3.      The Product at Phoenix's Warehouse .......................................... 4

                4.      The Delivery Drivers ...................................................................... 5

        B.      Phoenix Collects, Processes and Ships Across State Lines Empty Product
                Containers ................................................................................................................. 5

                1.      Glass Bottles .................................................................................... 6

                2.      Aluminum Cans ............................................................................... 6

                3.      Cardboard ......................................................................................... 6

                4.      Kegs .................................................................................................. 7

                5.      Pallets, Spacers, and Insulating Blankets ................................... 8

III.    Phoenix Responded to the U.S. Department of Labor's Inquiry that it Meets the
        Interstate Commerce Requirement of the Motor Carrier Exemption to the FLSA ............ 9

IV.     Plaintiffs' Weekly Salary Exceeds the Minimum Overtime Requirements Under
        New York State Law ........................................................................................................... 9

ARGUMENT .................................................................................................................................. 10

POINT I ......................................................................................................................................... 10

        THIS COURT SHOULD DISMISS PLAINTIFFS' AMENDED COMPLAINT
        PURSUANT TO FED. R. CIV. P. 12(b)(6) OR, ALTERNATIVELY, FED. R.
        CIV. P. 12(d) ......................................................................................................... 10

## TABLE OF CONTENTS
(continued)

Page

POINT II ..................................................................................................................... 11

    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE PHOENIX IS
    EXEMPT FROM THE OVERTIME PAY REQUIREMENTS OF THE FLSA .............. 11

POINT III ................................................................................................................... 18

    PLAINTIFFS HAVE NO CLAIM UNDER STATE LAW BECAUSE THEIR
    SALARIES FAR EXCEED THE OVERTIME PAY
    REQUIREMENTS UNDER NEW YORK STATE LAW ........................................... 18

POINT IV ................................................................................................................... 19

    PLAINTIFFS' CLAIMS OF RETALIATION UNDER THE FLSA AND NYLL
    ARE DERIVATIVE OF THEIR OVERTIME CLAIMS AND MUST ALSO BE
    DISMISSED ........................................................................................................... 19

POINT V ..................................................................................................................... 21

    THE COURT MAY DECLINE TO EXERCISE PENDANT JURISDICTION
    OVER PLAINTIFFS' STATE LAW CLAIMS ........................................................ 21

CONCLUSION ........................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bilyou v. Dutchess Beer Distribs., Inc.*,
   300 F.3d 217 (2d Cir. 2002) ............................................................................passim

*Bilyou v. Dutchess Beer Distribs., Inc.*,
   No. 99 CV 4231 (CM), 2001 WL 2867799 (S.D.N.Y. Mar. 9, 2001) .............................14, 17

*Collins v. Heritage Wine Cellars, Ltd.*,
   589 F.3d 895 (7th Cir. 2009) ...........................................................................18, 19

*Cortec Indus., Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991) .............................................................................11, 12

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
   713 F. Supp. 2d 286 (S.D.N.Y. 2010) .......................................................................11

*Johns v. Town of E. Hampton*,
   942 F. Supp. 99 (E.D.N.Y. 1996) ...........................................................................11

*Lore v. City of Syracuse*,
   670 F.3d 127 (2d Cir. 2012) ...............................................................................20

*Materazzi v. Atlas Van Lines, Inc.*,
   180 F. Supp. 2d 408 (E.D.N.Y. 2001) .......................................................................11

*McGuiggan v. CPC Int'l Inc.*,
   84 F. Supp. 2d 470 (S.D.N.Y. 2000) ........................................................................17

*Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*,
   No. 97 CIV. 4914(SS), 1997 WL 685334 (S.D.N.Y. Nov. 4, 1997)...........................................11

STATUTES

28 U.S.C. § 1367 ...........................................................................................22

29 U.S.C. § 213(b) .........................................................................................12

49 U.S.C. § 13102(15) ..................................................................................12, 13

49 U.S.C. § 13501 .........................................................................................13

Motor Carrier Act, Pub. L. No. 74-255, 49 Stat. 543 (1935) .................................................2

N.Y. Envtl. Conserv. Law §§ 27-1001 et seq................................................................8

## TABLE OF AUTHORITIES
### (continued)

Page(s)

N.Y. Lab. Law § 652 ................................................................................................ 20

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(d) ............................................................................................... 12

J. Sulds, 3 *New York Employment Law*, § 35.03[3][a] (Matthew Bender & Co., Inc. 2d ed.
    2012) ................................................................................................................. 20

Letter Opinion, RO-10-0025 (N.Y. State Dep't of Labor June 30, 2010) *available at*
    http://www.labor.ny.gov/legal/counsel/pdf/Overtime/RO-10-0025.pdf ................................. 20

N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 (2009)........................................... 19, 20

## PRELIMINARY STATEMENT

Defendants Windmill Distributing Company, LP, d/b/a Phoenix/Beehive, Phoenix Beverages, Inc., RODB, LLC, Longfeng Trucking, LLC, Phoenix Beverages MTO, LLC, Forbee Capital Keg Fund, LLC, Heineken USA Incorporated, Rodney Brayman, Gregory Brayman,[1] Paul Rossi, Joseph Stanich, and George Strada (collectively "Phoenix" or "Defendants") submit this memorandum of law in support of their motion for an order dismissing Plaintiffs' Amended Complaint under Fed. R. Civ. P. 12(b)(6) and, alternatively, Fed. R. Civ. P. 12(d).

Plaintiffs are delivery drivers who are, or in the case of Plaintiff Daheed Willis ("Willis") were, employed by Phoenix. In their Amended Complaint, Plaintiffs allege that Phoenix failed to comply with overtime pay requirements under the Fair Labor Standards Act ("FLSA"). Under the Motor Carrier Act, Pub. L. No. 74-255, 49 Stat. 543 (1935), however, Plaintiffs are exempt from the overtime pay requirements in the FLSA. Their FLSA claims, therefore, should be dismissed. In addition, Plaintiffs' state law claims should be dismissed because their salaries far exceed the overtime pay requirements under New York State Law. Finally, Plaintiffs' claims of retaliation under the FLSA and New York Labor Law ("NYLL") are derivative of their overtime claims and, therefore, also fail as a matter of law.

## FACTUAL STATEMENT

### I.   Plaintiffs' Allegations

Plaintiffs' Amended Complaint alleges that Plaintiffs are entitled to overtime wages from Defendants under the FLSA and NYLL. Am. Compl., ¶¶ 1-2. Plaintiffs are employed by Phoenix as delivery personnel. *Id.* at ¶ 101. Plaintiffs work or worked at Phoenix's main facility located at 2 Atlantic Avenue, Pier 7, in Brooklyn, New York, from where they are dispatched in teams of one driver and one helper. *Id.* at ¶¶ 103, 109. Plaintiffs receive documentation from

---

[1] Brayman is incorrectly spelled in the case caption as "Breyman."

Phoenix with the customers they are to visit that day and go through the documentation every morning to make their delivery route then go to their truck, which was fully loaded during the night by another team of workers working for Phoenix. *Id.* at ¶ 106. Plaintiffs' time is not tracked by Phoenix and Phoenix has told Plaintiffs that they are paid by the day, and not the hour, meaning that if they work more than eight (8) hours on one specific day, this still counts as one (1) day for them. *Id.* at ¶ 120. According to the Amended Complaint, even though Plaintiffs regularly worked in excess of forty (40) hours a week, Phoenix willfully failed to pay the Plaintiffs overtime compensation of one and one-half time their regular hourly rate, in violation of the FLSA and NYLL. *Id.* at ¶ 122.

In the case of Plaintiff Willis, Plaintiffs allege that Willis was terminated for asserting his rights under the FLSA and NYLL. *Id.* at ¶ 136. According to the Amended Complaint, Phoenix retaliated against Willis, who complained about his hours almost every day during the last weeks of his tenure with Phoenix, by terminating his employment on April 1, 2013. *Id.* at ¶¶ 137, 144.

## II.   **Phoenix's Business**

Phoenix is in the business of distributing alcoholic beverages to its customers located in New York State. Brayman Decl.[2], ¶ 12. Phoenix is primarily a distributor of beer products, but also distributes wine and spirits (collectively "liquor") products which account for about six percent (6%) of its beverage sales. *Id.*

Phoenix operates out of its warehouse located on Pier 7 of the Red Hook Marine Terminal in Brooklyn, New York, where its headquarters, personnel and administrative staff are located. Brayman Decl., ¶ 13. On Pier 11 of the Red Hook Marine Terminal, Phoenix operates its recycling facility. *Id.*

---

[2] "Brayman Decl." refers to the Declaration of Rodney Brayman in support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

A.   **The Products Phoenix Distributes Within New York State Are Transported Into New York Across State Lines**

1.   **The Beer Products**

Phoenix buys and receives almost all of its beer products from breweries located outside the State of New York.  Brayman Decl., ¶¶ 12, 14.  The brewers include Heineken, Miller Coors, Anchor Steam, Diageo Guinness (Harp, Smithwick's), Desnoes & Geddes (Red Stripe), CCM (Dos Equis, Tecate, Sol), Asahi, Presidente, Brasserie Nationale D'Haiti, S.A., Peroni, Birra Moretti, Pilsner Urquel, Mahou, Scottish and Newcastle, and others.  *Id.* at ¶ 14.  Each brewer appoints Phoenix as its exclusive distributor in some or all of the five boroughs of New York City and in other counties in New York State.  *Id.*

In the case of foreign brewers such as Heineken, Guinness, Harp, Kilkenny, Presidente, Smithwick's, Peroni, the brewers ship the beer to the United States, primarily to Port Newark, New Jersey.  Brayman Decl., ¶ 15.  The beer is shipped in bottles, cans and kegs in shrink-wrapped pallets which are placed in steel containers.  *Id.*  Phoenix owns the beer, glass bottles and aluminum can containers once it purchases the beer from the brewers.  *Id.*  The kegs and most of the wooden pallets remain the property of the brewer.  *Id.*  At Port Newark, longshoremen remove the beer from the cargo ships by crane and place it on trucks owned by contract carriers hired by Phoenix, who then transport the beer from New Jersey to Phoenix's Pier 7 warehouse.  *Id.*

The Mexican brewers such as Dos Equis, Tecate, and Sol, and domestic brewers such as Miller Brewing and Anchor Steam, ship the beer across state lines to New York State either by truck or by rail to either Phoenix's Pier 7 warehouse, a warehouse in Port Newark, New Jersey, or a rail yard in Montgomery, New York.  Brayman Decl., ¶ 16-17.  Phoenix owns the beer, glass bottles and aluminum can containers once it purchases the beer from the brewer.  *Id.*  The kegs

and wooden pallets remain the property of the brewer. *Id.* If shipped to Port Newark or

Montgomery, contract carriers hired by Phoenix pick up the beer and deliver it to Phoenix's Pier

7 warehouse. *Id.*

### 2.     The Liquor Products

As with the beer, the liquor products also come to Phoenix from outside the State of New

York. Brayman Decl., ¶ 18. The largest, Georgi Vodka made by Star Industries, is distilled by

Black Prince Distilling in Clifton, New Jersey, and trucked from New Jersey by contract carriers

to Phoenix's Pier 7 warehouse. *Id.* Phoenix owns the vodka and glass bottles once it purchases

the vodka from Star Industries. *Id.* The wooden pallets remain the property of Star Industries.

*Id.*

European wineries ship the wine to the United States, primarily to Port Newark, New

Jersey, in bottles in shrink-wrapped pallets ("Euro-Pallets"). Brayman Decl., ¶ 19. The Euro-

Pallets are placed in steel containers. *Id.* Phoenix owns the wine and glass bottles once it

purchases the wine from the wineries. *Id.* The Euro-Pallets remain the property of the wineries.

*Id.* At Port Newark, longshoremen remove the wine from the ships by crane and place it on

trucks owned by contract carriers hired by Phoenix, who then transport the wine from New

Jersey to Phoenix's Pier 7 warehouse. *Id.*

### 3.     The Product at Phoenix's Warehouse

Upon arrival at Phoenix's Pier 7 warehouse, Phoenix's warehousemen break down the

product for placement in its temperature-controlled warehouse, by brand, by case, and by keg.

Brayman Decl., ¶ 20. The product is pre-sold by Phoenix's salespersons; therefore, the beer and

liquor products and their containers stay at Phoenix's warehouse for a very short period of time.

*Id.* at ¶ 21. Depending on the brand and type of container (bottle, can, or keg), most containers

leave the warehouse (first in, first out) within 15 days after their arrival, but not longer than 30 days. *Id.* at ¶ 22.

Phoenix's warehousemen pick the pre-sold cases and kegs and load them with their pallets on Phoenix's delivery trucks. Brayman Decl., ¶ 22. Phoenix's delivery drivers deliver the product to Phoenix's customers. *Id.*

### 4.    The Delivery Drivers

Teamsters Local 812 represents Phoenix's delivery drivers and warehousemen under a current collective bargaining agreement ("CBA") with Phoenix and has done so for many years. Brayman Decl., ¶ 23. Local 812's collective bargaining agreements with Phoenix and other beer distributors, and due to the Motor Carrier Act exemption, do not provide for any rights under the FLSA for Phoenix's delivery drivers and expressly exempts, and has always expressly exempted, Phoenix's delivery drivers from the overtime and other requirements of the FLSA. *Id.* Indeed, the Motor Carrier Act exemption has long been the well-known and established practice in those beverage delivery operations, like Phoenix's, where the product moves into New York from out of New York and then back out of New York, albeit in a different form on its way out. *Id.*

### B.    Phoenix Collects, Processes and Ships Across State Lines Empty Product Containers

At the same time they deliver product to customers, Phoenix's delivery drivers, including Plaintiffs, also pick up from the customers empty bottles, cans, and kegs, as well as the cardboard cases in which the bottles were delivered, and the wooden pallets. Brayman Decl., ¶ 24. The delivery drivers return the empty cans, bottles, kegs, cardboard cases and wooden pallets to Pier 11 at Phoenix's Red Hook Marine Terminal where Phoenix's owned affiliate R. Mack runs its recycling operation with employees whom Local 812 also represents. *Id.* at ¶ 25.

The recycling operation includes crushing the glass bottles, crushing the aluminum cans, baling the cardboard cases, and preparing the kegs, pallets, spacers and blankets for their return to the breweries, distilleries and wineries. Brayman Decl., ¶ 26. Once the recycling process is complete, all of this material is shipped out of New York State to other states or countries. *Id.* The recycling operation has five distinct processes:

### 1. Glass Bottles

Phoenix's recycling operation crushes the empty bottles into 30-yard dumpsters. Brayman Decl., ¶ 27. Phoenix sells the crushed glass to EWG Glass Recycling in Jamaica, Queens. *Id.* The time period in which the empty glass bottles arrive at R. Mack, are crushed and picked up by EWG is one to two days. *Id.* EWG processes the glass by sifting out the caps and labels and then pulverizing the remaining crushed glass into furnace-ready cullets. *Id.* EWG sells the glass to Owens-Illinois at Owens-Illinois' mills in North Carolina and Pennsylvania, where the glass is melted down and made into new bottles. *Id.*

### 2. Aluminum Cans

After Phoenix's delivery drivers deliver the empty cans to Pier 11, Phoenix's recycling operation crushes the empty aluminum cans and bales them into 1500-pound bales. Brayman Decl., ¶ 30. The waiting time for empty aluminum can retrieval is generally up to 30 days. *Id.* Phoenix sells the bales to Alcoa's mill in Maryville, Tennessee and, on occasion, to Alcoa's mill in Kentucky. *Id.* The bales are trucked from New York State across state lines to Tennessee and Kentucky. *Id.*

### 3. Cardboard

When Phoenix's delivery drivers pick up the empty glass bottles from Phoenix's customers, the empty bottles normally are in a cardboard case. Brayman Decl., ¶ 33. Phoenix's delivery drivers deliver the cardboard cases to Pier 11, where Phoenix employees bale the

cardboard cases into 1200-pound bales. *Id.* The waiting time for cardboard case retrieval is three to four days. *Id.* The bales are then packed into 40-foot containers, which are trucked to a terminal at Port Newark, New Jersey, where they are shipped by contract carrier to India on the average of one load a week. *Id.*

The continuous preordained interstate movement of glass containers, aluminum can containers, and cardboard cases – i.e., the filled containers from out-of-state brewers, distilleries or wineries to Phoenix and from Phoenix to its customers; the pick-up and return of the empty containers by Phoenix from its customers to Phoenix's recycling operation; and the movement to final destinations outside of New York State – has gone through the same cycle for about 30 years, following the enactment of the Bottle Bill (New York Environmental Conservation Law §§ 27-1001 et seq.). Brayman Decl., ¶¶ 28, 31, 34. Before each shipment of product and before each shipment of the empty product containers begins, Phoenix knows the preordained routes the product and the empty product containers will take. *Id.* at ¶¶ 29, 32, 35.

### 4.  Kegs

Phoenix's delivery drivers also return the empty kegs to the Phoenix recycling operation where Phoenix employees arrange for their return to the applicable brewer. Brayman Decl., ¶ 36. Each keg is branded with the brewer's name and remains the property of the brewer. *Id.* The waiting time for empty kegs retrieval is up to 15 days. *Id.*

The empty Guinness kegs are hand-stacked in 45-foot high cube container placed in a steel ocean container. Brayman Decl., ¶ 37. The ocean containers are trucked from New York to Maher Terminal in Newark, New Jersey, from where they are shipped back to Guinness in Dublin, Ireland. *Id.* The empty Heineken kegs are placed on pallets which are put into a 40-foot steel ocean container. *Id.* at ¶ 38. The containers are trucked from New York to the Maher Terminal or APM Terminal, both in Newark, New Jersey, for shipment back to the Netherlands.

*Id.* The empty kegs of the Mexican beers and other foreign beers are packed into in a steel container which is trucked by contract carriers from New York to Kegspediter in Monroe Township, New Jersey. *Id.* at ¶ 39. Kegspediter sorts the kegs by destination and then ships them back to the respective out-of-state brewers. *Id.* The empty Miller kegs are placed on trucks at Phoenix and trucked back to Miller's brewery in Eden, North Carolina by contract carriers hired by Phoenix. *Id.* at ¶ 40.

This continuous preordained interstate movement – i.e., the filled kegs from out-of-state brewers to Phoenix and from Phoenix to its customers; the pick-up and return of empty kegs by Phoenix from its customers to Phoenix's recycling operation where Phoenix's employees prepare the kegs for out-of-state return to each brewer – has followed the same cycle since the inception of Phoenix's business. Brayman Decl., ¶ 41. Phoenix knows the preordained route of each brewers' kegs. *Id.* at ¶ 42. With kegs, the final destination is always the brewer. *Id.*

**5.  Pallets, Spacers, and Insulating Blankets**

The Miller returnable pallets, together with the spacers and blankets which go between the pallets in the incoming loads of full containers, are loaded by Phoenix on the trailers of various contract carriers and trucked from New York to Miller's brewery in Eden, North Carolina. Brayman Decl., ¶ 43. Heineken keg pallets are returned along with the empty kegs to the Heineken brewery in the Netherlands from where the filled kegs and pallets originated. *Id.* at ¶ 44. The Georgi Vodka pallets are put in a steel container and trucked from New York to Black Prince Distilling in Clifton, New Jersey from where the product originated. *Id.* at ¶ 45. The Euro-Pallets are trucked from New York to Port Newark, New Jersey and shipped back to the European wineries from where the product originated. *Id.* at ¶ 46.

This continuous preordained interstate movement – the product from out-of-state delivered on pallets to Phoenix and on pallets from Phoenix to its customers; the pick-up and

return of pallets by Phoenix from its customers to Phoenix's recycling operation where

Phoenix's employees stack and prepare the pallets for out-of-state return to the breweries,

distilleries and wineries from where they originated – has followed the same cycle since the

inception of Phoenix's business and, of course, Phoenix knows that cycle before each cycle

begins.  Brayman Decl., ¶¶ 47-48.

III.   **Phoenix Responded to the U.S. Department of Labor's Inquiry that it Meets the
       Interstate Commerce Requirement of the Motor Carrier Exemption to the FLSA**

       In July and August, 2012, the Wage and Hour Division of the U.S. Department of Labor

("DOL") inquired about "the applicability of the 'Motor Carrier Act exemption' of the Fair

Labor Standards Act, found at 29 U.S.C. § 213(b)(1) to the operations of [Phoenix]."  Brayman

Decl., ¶ 49.  In response, Phoenix submitted two letters, dated August 8 and August 21, 2012.

*Id.* at ¶ 50.  The August 8 letter makes specific reference to the Second Circuit Court of Appeals

decision in *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217 (2d Cir. 2002).  *Id.*

       The August 21 letter describes in detail Phoenix's delivery operations, which are

substantively identical to the Dutchess Beer Distributors operations in *Bilyou*, and demonstrates

that under *Bilyou*, the Motor Carrier Act exemption of the FLSA, 29 U.S.C. § 213(b)(1), applies

to Phoenix's operations.  Brayman Decl., ¶ 50.  The DOL has made no further inquiry.  *Id.* at ¶

51.

IV.   **Plaintiffs' Weekly Salary Exceeds the Minimum Overtime Requirements Under New
      York State Law**

       Plaintiffs were or are delivery drivers employed by Phoenix.  Brayman Decl., ¶ 52.

Under the CBA, there are no weekly hour requirements identified for delivery drivers.  *Id.* at ¶

53.  Rather, a day's work for a driver and helper is defined as the completion of a minimum load

of 500 cases regardless of how long it takes.  *Id.*  Phoenix pays its delivery drivers a weekly

salary which, each year beginning January 1, 2010, exceeded $900, plus commissions paid based

on cases and kegs delivered, plus commissions paid based on empty containers picked up and returned to Pier 11. *Id.* at ¶ 52.

## ARGUMENT

### POINT I

### THIS COURT SHOULD DISMISS PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) OR, ALTERNATIVELY, FED. R. CIV. P. 12(d)

A Rule 12(b)(6) motion may be granted where the allegations of a complaint are contrary to existing and controlling legal authority. *See, e.g., Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010) (dismissing allegations of antitrust violations because the "case falls squarely under the controlling precedents of [a Supreme Court case and a Second Circuit case] ... ."); *Materazzi v. Atlas Van Lines, Inc.*, 180 F. Supp. 2d 408, 410 (E.D.N.Y. 2001) (dismissing claims alleging damage to belongings because claims preempted based on prior case law, including one case with "identical facts" to those at issue); *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, No. 97 CIV. 4914(SS), 1997 WL 685334, at *3 (S.D.N.Y. Nov. 4, 1997) (dismissing claim for fraudulent inducement, because claim is "controlled by the line of New York case law ... .").

Phoenix files in support of its motion the Declarations of Rodney Brayman and Robert E. Crotty, Esq., and the exhibits attached thereto. These documents are properly considered by this Court on Phoenix's motion to dismiss because they are necessary to set forth the pertinent facts – all of which were known to Plaintiffs prior to their filing the Amended Complaint – that are dispositive of Plaintiffs' claims. *Cf. Johns v. Town of E. Hampton*, 942 F. Supp. 99, 104 (E.D.N.Y. 1996) ("It is well established that when a 'plaintiff fails to introduce a pertinent document as part of his pleading, [a] defendant may introduce the exhibit as part of his motion attacking the pleading.'" (citation omitted)) (relying on *Cortec Indus., Inc. v. Sum Holding L.P.*,

949 F.2d 42, 48 (2d Cir. 1991) (a court may consider documents annexed to the movant's papers which, although not annexed to the complaint, plaintiff either had "in [his] possession or had knowledge of and upon which [he] relied in bringing suit")).

Alternatively, of course, this Court may consider the facts presented by Phoenix and convert the present motion to one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d). However, the need to do so is largely dissipated where, as here, "plaintiff has actual notice of all the information in the movant's papers ... ." *Cortec Indus.*, 949 F.2d at 48.

**POINT II**

**PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE PHOENIX IS EXEMPT FROM THE OVERTIME PAY REQUIREMENTS OF THE FLSA**

Plaintiffs' FLSA claims fail as a matter of law. Under the Motor Carrier Act, Phoenix is a "motor private carrier"; as such, the Secretary of Transportation sets the "maximum hours of service" for Phoenix's delivery drivers. Phoenix's delivery drivers, therefore, are exempt from the FLSA.

The FLSA exempts from its overtime pay requirements any employee "with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to [49 U.S.C. §] 31502" – the Motor Carrier Act. 29 U.S.C. § 213(b)(1). Pursuant to his authority under the Motor Carrier Act, the Secretary of Transportation may establish the "qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier ... ."

Phoenix is a "motor private carrier." Under 49 U.S.C. § 13102(15), a "motor private carrier" is defined as:

> [A] person, other than a motor carrier, transporting property by motor vehicle when –
>
> (A) the transportation is as provided in section 13501 of this title;

-11-

(B) the person is the owner, lessee, or bailee of the property being transported; and

(C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

Phoenix is a "motor private carrier" because it is a "person ... transporting property by motor vehicle"; it is "the owner ... of the property being transported"; and "the property is being transported for sale ... or to further a commercial enterprise." 49 U.S.C. § 13102(15).

Section 13501 gives the Secretary of Transportation jurisdiction over transportation by motor private carrier if passengers or property are transported:

(1) between a place in –

(A) a State and a place in another State; ... or

(E) the United States and a place in a foreign country to the extent the transportation is in the United States.

49 U.S.C. § 13501.

Thus, Phoenix fits squarely within the definition of a "motor private carrier" so long as the transportation in which it engages "is as provided in section 13501" – i.e., that the beer and liquor products that Phoenix distributes are transported in the United States between a place in a State and a place in another State or a place in the United States and a place in a foreign country. The Second Circuit has interpreted section 13501 to cover intrastate transportation of property that is part of a "'practical continuity of movement' in the flow of interstate commerce." *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217 (2d Cir. 2002). *Bilyou* is dispositive of Plaintiffs' allegations here.

In *Bilyou*, the plaintiff had worked as a delivery route driver for DBD prior to his termination for cause. *Id.* at 219. He alleged that he regularly worked more than 40 hours per week and was entitled under the FLSA to overtime pay of one and one-half times his regular rate

of pay. *Id.* The Second Circuit affirmed the District Court's order granting summary judgment dismissing the complaint because defendant Dutchess Beer Distributors' ("DBD") empty container return operations were in interstate commerce and, therefore, its delivery drivers who were involved in that operation were exempt from other FLSA overtime pay requirements. *Id.* at 224. The District Court had held that DBD's beer delivery operations were also in interstate commerce. *See Bilyou v. Dutchess Beer Distribs., Inc.*, No. 99 CV 4231 (CM), 2001 WL 2867799 (S.D.N.Y. Mar. 9, 2001). Because the Second Circuit Court held that DBD's return operations were in interstate commerce, it found it "unnecessary to determine whether DBD's intrastate distribution of out-of-state products also meets the interstate commerce requirement." *Bilyou*, 300 F.3d at 224.

DBD conducts its business – as do all beer distributors – substantially like Phoenix. DBD received beer from outside New York State and distributed beer and other beverages to its customers in the Hudson Valley region of New York State. *Id.* at 219. DBD ran its distribution operation out of a processing center in Poughkeepsie, New York, and a warehouse in Kingston, New York. *Id.* Next to DBD's Poughkeepsie center was a recycling facility operated by Mid-Hudson Aluminum Can-Recycling, Inc. ("Mid-Hudson"), which was owned by the owners of DBD and processed only DBD products. *Id.*

DBD was the exclusive distributor of Anheuser-Busch ("AB") in the Hudson Valley area and received most of its inventory from breweries, including AB, located outside of New York State. *Id.* AB's products were shipped to DBD's processing center in Poughkeepsie from breweries in Newark, New Jersey and Merrimack, New Hampshire. *Id.*

Phoenix's operation is legally the same as DBD's. We, therefore, quote the Second Circuit's description of DBD's return of empty bottles, cans, kegs, and pallets at length:

Products are delivered daily from breweries, mostly out of state, to DBD's processing center. DBD takes title to the products upon delivery at its processing center or warehouse. Approximately 25 to 30 tractor trailer loads of products are received each week. DBD arranges to receive products from most out-of-state breweries through "third-party contract haulers." DBD's own drivers do not transport the products from supplying breweries. The products have not been designated for a final retailer at the time of delivery. Most products arrive at the warehouse in shrink-wrapped stacked pallets, and are then organized and divided in DBD's temperature controlled facility by container, brand, and flavor. DBD's storage time for beer products varies from two weeks to one month. DBD generally keeps an inventory on hand worth between $2–2.2 million.

DBD utilizes its own sales staff. Retail customers place orders directly with DBD. After receiving orders from customers, DBD prepares a load sheet for each of its route drivers. The route drivers load their trucks according to the load sheets and deliver the products to various customers. All of DBD's deliveries occur within the State of New York. Distribution areas include Dutchess, Ulster, Greene, Columbia and Delaware counties.

Upon making product deliveries, DBD route drivers collect empty product containers ("empties") from customers and transport them to either DBD's Kingston facility or Mid–Hudson's facility in Pough-keepsie. Empties include aluminum cans, glass and plastic containers, and returnable or refillable containers such as empty barrels, bottles, and pallets. Route drivers like Bilyou, who drive out of the Poughkeepsie facility, deliver all collected empties to Mid–Hudson. Drivers working out of the Kingston warehouse return aluminum empties to the Kingston facility, and other empties to Mid–Hudson. Most of the empties are taken to the Mid–Hudson facility.

As to the glass empties, Mid–Hudson purchases them from DBD, crushes them, and then sells them to different suppliers. Mid–Hudson makes all arrangements for the shipment or pick-up of the crushed glass, and purchasers of the glass pay Mid–Hudson directly. Mid–Hudson ships out or arranges the pick-up of the crushed glass in tractor trailers to Connecticut or Pennsylvania about three times a week. Mid–Hudson also processes plastic empties, refillable and returnable containers, and some of the aluminum empties. As to the aluminum empties, Mid–Hudson purchases them from DBD, crushes and sells them, and sends them to Connecticut approximately three times per month.

> Mid–Hudson also packages the returnable containers and loads
> them onto trailers in preparation for their return to the brewery.
> AB is generally the only vendor to whom returnable containers are
> sent on a regular basis. AB sends DBD preprinted invoices for the
> return of refillable empties, designating DBD as the sender of the
> empties. DBD pays an advance deposit for the refillable empties,
> and it recoups between $20,000 and $30,000 in monthly credit
> upon returning the containers. Several tractor trailers of refillable
> empties are returned to the breweries each week. DBD contracts
> with a third party hauler, North–Bergen Transport, Inc., which
> picks up the loaded trailers and drops them off at an out-of-state
> brewery.
>
> Some of the aluminum empties are also taken to DBD's Kingston
> facility, where they are flattened and loaded onto a trailer to be
> picked up by Reynolds Aluminum. Reynolds purchases the
> processed aluminum empties from DBD and takes them to a recy-
> cling plant in Connecticut.

*Id.* at 220-21.

Bilyou argued that DBD's carriage of goods did not meet the requirements of 49 U.S.C.

§ 13501 because it was not "between a State and a place in another State." *Id.* at 223. The

Second Circuit held, however, that "[e]ven if a carrier's transportation does not cross state lines,

the interstate commerce requirement is satisfied if the goods being transported within the borders

of one State are involved in a 'practical continuity of movement' in the flow of interstate

commerce." *Id.* (citing cases). "Whether the transportation is of an interstate nature can be

'determined by reference to the intended final destination' of the transportation when that

ultimate destination was envisaged at the time the transportation commenced." *Id.* at 223-24. In

other words, "[t]he intent at the time transportation commences 'fixes the character of the

shipment for all the legs of transport within the United States.'" *Id.* at 224 (citation omitted).

The Second Circuit concluded that:

> In the course of delivering products to retail customers, Bilyou
> regularly picked up glass, plastic, and aluminum empties, as well
> as refillable containers, and carried them to Mid-Hudson's facility
> in Poughkeepsie for further shipment several times a week to

> destinations outside the State.  Although Bilyou's carriage of the
> empties took place entirely within the State of New York, his
> carriage was merely one leg of a route to an out-of-state
> destination.  His segment of the transportation of those empties
> was part of the interstate movement of goods.

*Id.*   Thus, the Court determined that DBD satisfied the interstate commerce requirement of the

Motor Carrier exemption and was exempt from the overtime requirements of the FLSA.

As in *Bilyou*, Plaintiffs here collect empty product containers and return them to the

recycling center of Phoenix's owned affiliate R. Mack.  Brayman Decl., ¶¶ 24-25.  From there,

all recycled products are shipped to out-of-state locations.  *Id.* at ¶¶ 26, 27-35.  In addition,

Plaintiffs deliver and collect returnable products and refillable containers that are returned by

Phoenix across state lines to brewers and wineries throughout the United States and in foreign

countries.  *Id.* at ¶¶ 26, 36-48.  Thus, from the moment it receives the returnable and refillable

containers, Phoenix has a "fixed and persisting intent" to return the refillable containers to out-

of-state breweries.  *See Bilyou*, 300 F.3d at 225.  Under the Second Circuit's holding in *Bilyou*,

therefore, the motor carrier exemption to the FLSA applies here and Plaintiffs' Amended

Complaint should be dismissed.

As noted above, the Second Circuit did not reach DBD's first argument that its

distribution within New York State of out-of-state products satisfied the interstate commerce

requirement.  In the District Court opinion, however, *Bilyou*, 2001 WL 2867799, Judge

McMahon, relying on her earlier opinion in *McGuiggan v. CPC Int'l Inc.*, 84 F. Supp. 2d 470

(S.D.N.Y. 2000), found that DBD's operations evidenced "a 'fixed and persisting intent' to

transport and distribute goods produced in one state and sold in another."  *Bilyou*, 2001 WL

286779, at *4.  The District Court noted it was "hard pressed" to find a better example of

interstate commerce where "[t]he products [in *Bilyou*] were produced in one state and sold in

another."  *Id.* at *3.  Likewise, Phoenix's distribution in New York of products produced in other

states and countries, squarely satisfies the interstate commerce requirement because those products are shipped across state lines.

In *Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895 (7th Cir. 2009), defendant Heritage Wine Cellars ("Heritage") was a wholesale wine importer and distributor. Its truck drivers sued Heritage under the FLSA alleging they were not paid overtime for hours worked over forty in one week. *Id.* at 896. The wine sold by Heritage was delivered to the Heritage warehouse from outside the State of Illinois by truck companies and other carriers independently contracted with by Heritage. *Id.* The plaintiff truck drivers delivered the wine from Heritage's warehouse near Chicago, Illinois to stores in Illinois. *Id.* The Seventh Circuit considered whether "the portion of the transportation that is entirely within Illinois is nevertheless interstate commerce within the meaning of the Motor Carrier Act." *Id.* at 896-97.

The Court, by Judge Posner, held that the transportation of Heritage's wine within Illinois was in interstate commerce:

> It seems to us that when a shipper transports his product across state lines for sale by him to customers in the destination state, and the product undergoes no alteration during its journey to the shipper's customer, and interruptions in the journey that occur in the destination state are no more than the normal stops or stages that are common in interstate sales, such as temporary warehousing, the entire journey should be regarded as having taken place in interstate commerce within the meaning of the Motor Carrier Act's exemption from the Fair Labor Standards Act.

*Id.* at 898. Thus, the Court focused on the continuing and uninterrupted nature of the shipments, finding that about a fourth of the wine that Heritage shipped to its Illinois warehouse had been ordered in advance by retail stores and stayed in the warehouse only briefly. *Id.* The other three-fourths, though it sat in the warehouse until Heritage could find a buyer, turned over approximately every month. *Id.*

Here, contract carriers deliver beer and alcohol products across state lines to Phoenix's warehouse on Pier 7 of the Red Hook Marine Terminal in Brooklyn, New York.  Brayman Decl., ¶¶ 12-19.  Though it varies depending on the brand and type of container (bottle, can, or keg), most filled containers leave the warehouse within fifteen days after their arrival, but not longer than thirty days. *Id.* at ¶¶ 21-22.  The warehousemen pick the pre-sold cases and kegs and load them with their pallets on Phoenix's delivery trucks for delivery to Phoenix's customers. *Id.* at ¶ 22.  This is no more than temporary warehousing of the sort that the Seventh Circuit held is common in interstate sales.  The "entire journey," therefore, from the out-of-state breweries, distilleries and wineries to Phoenix's in-state customers "should be regarded as having taken place in interstate commerce within the meaning of the Motor Carrier Act's exemption from the Fair Labor Standards Act." *Collins*, 589 F.3d at 898.

For these reasons, the FLSA is not applicable to Plaintiffs and the Court should dismiss Plaintiffs' FLSA claims.

## POINT III

### PLAINTIFFS HAVE NO CLAIM UNDER STATE LAW BECAUSE THEIR SALARIES FAR EXCEED THE OVERTIME PAY REQUIREMENTS UNDER NEW YORK STATE LAW

Plaintiffs' third and fourth causes of action under the New York State Labor Law ("NYLL") should also be dismissed because Plaintiffs' salaries during the course of their employment far exceeded the wage and overtime pay requirements under New York law. Pursuant to the New York Codes, Rules and Regulations, title 12, section 142-2.2:

> An employer shall pay an employee for overtime at a wage rate of 1½ times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 USC 201 et seq., the Fair Labor Standards Act of 1938, as amended ....  In addition, an employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standards Act, as

> amended, ... overtime at a wage rate of 1½ times the basic
> minimum hourly rate.

N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 (2009).

Accordingly, for employees exempt from the FLSA's overtime provisions, such as

Plaintiffs, New York's overtime provisions are deemed met if their salaries exceed the product of

the minimum statutory hourly wage, times the sum of all hours actually worked in excess of

forty hours in a week.  *See* J. Sulds, 3 *New York Employment Law*, § 35.03[3][a] (Matthew

Bender & Co., Inc. 2d ed. 2012).  New York's Minimum Wage Act provides that the minimum

hourly rate is $7.25.  N.Y. Lab. Law § 652.  *See also* Letter Opinion, RO-10-0025 (N.Y. State

Dep't of Labor June 30, 2010), *available at*

http://www.labor.ny.gov/legal/counsel/pdf/Overtime/RO-10-0025.pdf.

Here, the salary paid to each Plaintiff far exceeded the New York required minimum of

time and a half of the basic minimum wage for hours worked in excess of forty in a week.  As

such, Plaintiffs' NYLL claims for wage and overtime compensation cannot stand.

## POINT IV

### PLAINTIFFS' CLAIMS OF RETALIATION UNDER THE FLSA AND NYLL ARE DERIVATIVE OF THEIR OVERTIME CLAIMS AND MUST ALSO BE DISMISSED

Plaintiffs allege that Phoenix retaliated against them in unspecified ways when "they

would complain about their hours or their work" (Am. Compl. ¶ 135) and in the case of Plaintiff

Willis, who "complained about his hours almost every day during the last weeks of his tenure

with Defendants" (Am. Compl. ¶ 137), Defendants terminated his employment on April 1, 2013,

purportedly for "asserting his rights under the FLSA" (Am. Compl. ¶¶ 136, 144).

Even assuming these allegations are true, and they are not, neither Willis nor any Plaintiff

had any reasonable cause to believe that they had any rights under the FLSA.  *See Lore v. City of

Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012) (Prima facie case of retaliation requires showing

that: (1) employee was engaged in protected activity; (2) employer was aware of that activity; (3) employee suffered a materially adverse action; and (4) a causal connection between the protected activity and that adverse action.).

Plaintiffs' employment is covered by a Union contract with the leading beverage Union in the Greater Metropolitan Area, Teamsters Local 812. Brayman Decl., ¶ 23. Common with Local 812's collective bargaining agreements with other beer distributors, and due to the Motor Carrier Act, the collective bargaining agreement between Phoenix Beverages and Local 812 ("CBA") does not provide for any rights under the FLSA for the Beer Delivery Drivers and expressly exempts, and has always expressly exempted, such employees from the overtime and other requirements of the FLSA due to the application of the Motor Carrier Act exemption of the FLSA. *Id.* Thus, under the CBA, there are no weekly hour requirements identified for delivery drivers. *Id.* at ¶ 53. Rather, a day's work for a driver and helper is defined as the completion of a minimum load of 500 cases regardless of how long it takes. *Id.* Such an exemption has long been the well-known and established practice in those beverage delivery operations where the product moves into New York from out of New York and then back out of New York, albeit in a different form on its way out. *Id.* at ¶ 23. Accordingly, neither Willis nor any Plaintiff was engaged in any protected activity under the FLSA and their federal retaliation claims fail as a matter of law.

Plaintiffs' state claims for retaliation must also be dismissed. Even assuming NYLL prevents retaliatory actions against an employee engaged in a protected activity, there is no reason to believe that Plaintiffs had a rational basis for believing they were engaged in a protected activity by claiming they were being deprived of wages and overtime payment under the NYLL. Instead, they would be engaged in the unprotected activity of attempting to set their

own terms and conditions of employment with Phoenix contrary to the Motor Carrier Act

exemption of the FLSA, the NYLL, and the CBA.

## POINT V

### THE COURT MAY DECLINE TO EXERCISE PENDANT JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS

A district court has the discretion to decline to exercise supplemental jurisdiction under

28 U.S.C. § 1367 if, among other things, the state law claim substantially predominates over the

federal claim.  As demonstrated above, Plaintiffs' FLSA claims for overtime compensation and

retaliation fail as a matter of law.  As such, there is no federal issue before this Court.  Under the

same circumstances in *Bilyou*, 2001 WL 286779, at *5, Judge McMahon declined to exercise

pendant jurisdiction over the state claims.

### CONCLUSION

For the foregoing reasons, Phoenix respectfully requests that the Court dismiss Plaintiffs'

Amended Complaint in its entirety.

Dated: New York, New York
      May 30, 2013

KELLEY DRYE & WARREN LLP

By: _____
    Eugene T. D'Ablemont
    Robert E. Crotty
    Taraneh J. Marciano
    101 Park Avenue
    New York, New York 10178
    Telephone:  (212) 808-7800
    Facsimile:  (212) 808-7897
    edablemont@kelleydrye.com
    rcrotty@kelleydrye.com
    tmarciano@kelleydrye.com

*Attorneys for Defendants*